Ramona HARRIS, Appellant,

v.

TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, Appellee.

No. 03–05–00244–CV.

Court of Appeals of Texas, Austin.

June 15, 2007.

Edmund M. (Skip) Davis, Austin, for Appellant.

Duke Hooten, Office of Atty. Gen., Richard Deck, Special Litigation Atty., Boerne, for Appellee.

Before Chief Justice LAW, Justices PATTERSON and PURYEAR.

## *OPINION*

DAVID PURYEAR, Justice.

Appellant Ramona Harris gave birth to C.C.H. on February 3, 2001. The Texas Department of Family and Protective Services first got involved with Harris in late 1999 and removed her three older children from her care in 2000. When C.C.H. was born, the Department immediately took custody of him and placed him in foster care with his older siblings.[1] The cause was submitted to a jury in October 2004, and the jury returned a verdict finding that Harris's parental rights to C.C.H.

should not be terminated and that she should be named his managing conservator. The Department filed a motion for new trial, arguing that the jury's finding on conservatorship was against the great weight and preponderance of the evidence, manifestly unjust, and not in C.C.H.'s best interest. The child's attorney ad litem filed a motion asking the court to designate the Department as C.C.H.'s managing conservator.

Seven months later, in early April 2005, the trial court signed an order in accordance with the jury's finding that Harris's parental rights should not be terminated. However, the court went on to state that the jury's finding that Harris should be appointed managing conservator was "against the greater weight and degree of the credible evidence" and not in the child's best interest. The court named the Department as C.C.H.'s sole managing conservator and Harris as possessory conservator, with "supervised visitation ... as has been in effect in the past." It is from this order that Harris appeals. She argues that the trial court erred in disregarding the jury's finding that she should be appointed C.C.H.'s managing conservator. She further argues that the trial court's judgment (1) did not make the findings necessary to name the Department as C.C.H.'s managing conservator, (2) granted relief not requested by the Department, and (3) did not grant relief that was in the child's best interest. We reverse the trial court's order.

---

1. Harris's parental rights to her older children were terminated in an earlier proceeding. *See Harris v. Texas Dep't of Protective & Regulatory Servs.*, No. 03–01–00643–CV, 2003 Tex.App. LEXIS 2842, at *1, 2003 WL 1738390, at *1 (Tex.App.-Austin Apr.3, 2003, no pet.) (memo.op.). The Department first sought to terminate Harris's rights to C.C.H. in that proceeding but could not yet establish grounds for termination as to C.C.H. *See* Tex. Fam.Code Ann. § 161.001 (West Supp.2006) (grounds for termination). The trial court's decree terminated Harris's rights to her older children and appointed the Department as C.C.H.'s managing conservator. The older children have been adopted by their foster parents, the same parents fostering C.C.H. Harris also has one younger child, N.H., who was removed from her care by the Department shortly before this trial but was not part of this proceeding.

### Which statutes apply?

The cause before us involves the interaction of several sections of chapter 5 of the family code, including sections 105.002, 161.205, and 263.404. We must therefore determine how these statutes should be interpreted and applied and whether they can coexist or are in conflict. Harris argues that section 105.002 of the family code prohibited the trial court from disregarding the jury's finding as to conservatorship. *See* Tex. Fam.Code Ann. § 105.002 (West Supp.2006). The Department, on the other hand, argues that the trial court did not err in entering its order, relying on section 161.205 of the family code, which it argues is a more specific statute that should control over section 105.002. *See id.* § 161.205 (West 2002).

 Section 105.002 provides that in most suits affecting a parent-child relationship, (1) a party is entitled to a jury trial, and (2) the trial court may not contravene the jury's verdict on the appointment of managing or possessory conservators. *Id.* § 105.002(a), (c). In determining issues of conservatorship and possession of a child, the child's best interest must be the trial court's primary consideration. *See id.* § 153.002 (West 2002). There is a strong presumption that a parent should be appointed managing conservator unless that appointment is not in the child's best interest and would significantly impair the child's physical health or emotional development. *Id.* § 153.131(a) (West 2002); *Lewelling v. Lewelling,* 796 S.W.2d 164, 166–67 (Tex.1990). Under chapter 161, which governs suits seeking to terminate a parent's relationship with her child, *see* Tex. Fam.Code. Ann. §§ 161.001–.211 (West

2002 & Supp.2006), if a trial court does not terminate a parent's rights, it shall either deny the petition or "render any order in the best interest of the child." *Id.* § 161.205. The Department contends that section 161.205 authorized the trial court to disregard the jury's findings as to conservatorship and appoint the Department as managing conservator. We disagree.

When a child has been taken into the Department's care, the trial court must conduct periodic hearings to review conservatorship and a parent's attempts to regain custody of her child. *See id.* §§ 263.001–.503 (West 2002 & Supp.2006). Under chapter 263, a trial court must render a final order within eighteen months of the Department's appointment as temporary managing conservator.[2] *Id.* § 263.401(a), (b) (West Supp.2006). A final order is one that orders the child returned to the parent, terminates the parent-child relationship, names a relative or other person as the child's managing conservator, or appoints the Department managing conservator without terminating the parent's rights. *Id.* § 263.401(d). Section 263.404 allows a trial court to render a final order that does not terminate a parent's rights yet names the Department as managing conservator if the court finds (1) that the appointment of the parent as managing conservator would not be in the child's best interest because it would significantly impair the child's physical or emotional well-being and (2) that it is not in the child's best interest to appoint a relative or another person as the child's managing conservator. *Id.* § 263.404(a) (West 2002). In making that decision, the trial court should consider the child's age, needs, and desires, whether a child twelve

---

**2.** An earlier trial on the termination of Harris's rights to C.C.H. ended in a mistrial, and as a result, these proceedings extended past the eighteen-month deadline for a termination suit. *See* Tex. Fam.Code Ann. § 263.401 (West Supp.2006). Shortly before trial, Harris filed a motion to dismiss the termination suit for lack of jurisdiction "as provided for by Chapter 263 of the Texas Family Code." The trial court denied the motion, and Harris does not discuss this issue on appeal.

or older has expressed strong feelings against termination or being adopted, and any special needs that would reduce the child's chances of being adopted. *Id.* § 263.404(b).

In construing a statute, we look to the legislature's intent, first examining the plain language used. *Lenz v. Lenz,* 79 S.W.3d 10, 19 (Tex.2002). The legislature enacted section 105.002 as part of subtitle A, "General Provisions," which governs all suits affecting the parent-child relationship. Contrary to the Department's contention, Texas courts have considered section 105.002 in several contexts, including termination, and have applied it in conjunction with statutes governing termination suits. *See Taylor v. Texas Dep't of Protective & Regulatory Servs.,* 160 S.W.3d 641, 653–54 (Tex.App.-Austin 2005, pet. denied) (section 105.002 applied in suit in which parents' rights were terminated and grandmother sought conservatorship); *Corrales v. Department of Family & Protective Servs.,* 155 S.W.3d 478, 488 (Tex. App.-El Paso 2004, no pet.) (section 161.207, which requires appointment of managing conservator after parental rights are terminated, "must be read in conjunction with Section 105.002," and court "may not contravene a jury verdict concerning the appointment of a sole managing conservator"); *In re Rodriguez,* 940 S.W.2d 265, 271 (Tex.App.-San Antonio 1997, writ denied) (applying section 105.002 in suit asking whether father or guardian should be appointed managing conservator); *see also Lenz,* 79 S.W.3d at 13, 19–20 (applying section 105.002 to order imposing geographical limitation on children's residence).

The jury found, and the trial court entered judgment in conformity with that finding, that Harris's parental rights to C.C.H. should not be terminated. Once that decision was made, the only issue that remained was who should be named as managing conservator of C.C.H. A trial court that does not terminate a parent's rights in a termination suit must either dismiss the petition or enter an order in the child's best interest. Tex. Fam.Code Ann. § 161.205. In making its orders, the trial court may not contravene the jury's determination of conservatorship unless the jury's findings are not supported by the evidence. *Lenz,* 79 S.W.3d at 20 ("because we have concluded that there is legally sufficient evidence to support the jury's verdict in this case, we further conclude that the trial court improperly contravened the jury's verdict by imposing a geographical restriction on the boys' primary residence"); *Taylor,* 160 S.W.3d at 653–54; *Rodriguez,* 940 S.W.2d at 271; *see also Corrales,* 155 S.W.3d at 488 (court may not contravene jury verdict on sole managing conservator, and conservatorship decision is reviewed not for abuse of discretion but under traditional sufficiency standards); *In re W.H.M.,* No. 01–00–01396–CV, 2003 Tex.App. LEXIS 8548, at *19–23, 2003 WL 22254713, at *7 (Tex. App.-Houston [1st Dist.] Oct. 2, 2003, pet. denied) (mem.op.) (holding that "jury's findings regarding ... managing or possessory conservatorship had to be supported by a preponderance of the evidence," citing family code section 105.005, and noting that jury's custody determination is binding on trial court if supported by evidence); *Brunson v. Brunson,* 502 S.W.2d 578, 579 (Tex.Civ.App.-Fort Worth 1973, no writ) (applying predecessor to section 105.002 and holding that "in order for the jury verdict to be binding upon the court it must be supported by evidence of probative force"). We must conduct a traditional sufficiency review to determine whether the trial court erred in contravening the jury's conservatorship determination. *See Lenz,* 79 S.W.3d at 19–20; *Brunson,* 502 S.W.2d at 579–80.

Harris is attacking the trial court's disregard of a jury's finding in her favor on

an issue on which the Department had the burden of proof. *See In re W.G.W.,* 812 S.W.2d 409, 413 (Tex.App.-Houston [1st Dist.] 1991, no writ) (party seeking to bar natural parent from appointment as managing conservator must show that child's best interest "would be best served by the appointment of a non-parent"). Therefore, we ask whether there was legally sufficient evidence to support the jury's finding; if there was legally sufficient evidence, the trial court erred in contravening the jury's finding. *See Lenz,* 79 S.W.3d at 19–20; *Brunson,* 502 S.W.2d at 579; *see also John Paul Mitchell Sys. v. Randall's Food Markets, Inc.,* 17 S.W.3d 721, 728 (Tex.App.-Austin 2000, pet. denied) ("We will uphold a trial court's judgment notwithstanding the verdict only if we determine that there is no evidence to support the jury's findings."). We view the evidence in the light most favorable to the jury's finding, indulging every reasonable inference that supports the finding, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 807, 821–22 (Tex. 2005). If reasonable jurors could differ in their conclusions, we may not substitute our judgment for the jury's, and we must defer to the jury's determinations of the credibility of the witnesses, the weight to be given the testimony, and the resolution of evidentiary conflicts. *Id.* at 819–20, 822. In other words, the trial court could have contravened the verdict only if a reasonable fact-finder *could not* have resolved the factual disputes in favor of the verdict.

*See id.* at 823 ("Judgment without or against a jury verdict is proper at any course of the proceedings only when the law does not allow reasonable jurors to decide otherwise."). Finally, in conducting our review, we must keep in mind the rebuttable statutory presumption that it is in a child's best interest for his parent, rather than a non-parent, to be appointed managing conservator. Tex. Fam.Code Ann. § 153.131; *Lewelling,* 796 S.W.2d at 166–67.

## Sufficiency of the evidence supporting the jury's finding

■ C.C.H. was born on February 3, 2001. At the time he was born, the Department had been involved with Harris and her three older children through referrals dating back to late 1999. In mid-2000, the Department removed the three older children from Harris's care, and her parental rights to those children were terminated in October 2001. *See Harris v. Texas Dep't of Protective & Regulatory Servs.,* No. 03–01–00643–CV, 2003 Tex. App. LEXIS 2842, at *1, 2003 WL 1738390, at *1 (Tex.App.-Austin Apr.3, 2003, no pet.) (memo.op.). C.C.H. was removed from Harris's care immediately after he was born and placed in the same foster home as his older siblings. When Harris's rights to her older children were terminated, the Department was named temporary managing conservator; the trial court did not name Harris as his possessory conservator. Although Harris requested visitation several times, the Department denied her requests because she was not a possessory conservator.[3] At the time of

---

**3.** The dissent states that "[f]or reasons not in the record, Harris was generally denied visitation." This is incorrect. The record reflects that Harris had a few visits with C.C.H. before the termination trial related to the older children, but after that trial, the trial court entered a final order terminating Harris's rights to her older children and appointing the Department C.C.H.'s managing conservator. Because the order did not appoint Harris as possessory conservator, the Department refused to allow her visitation from that point on. Former Department caseworker Kellie Ragland testified to that effect, and the record includes a letter to Harris from Ragland dated October 21, 2002, in which Ragland stated that Harris was not entitled to

trial in October 2004, Harris had been allowed to visit C.C.H. three times.

Most of the Department's evidence related to her behavior with her older children because the Department had removed C.C.H. from Harris's custody shortly after his birth and limited her contact with him during the pendency of this suit.[4] Harris was referred to the Department in 1999, when her older daughter made an outcry that she had been sexually abused by Harris's boyfriend. Harris initially disbelieved her daughter but later acknowledged the abuse. The boyfriend later pled guilty to the charge and was sentenced to prison. Although she agreed not to allow the boyfriend who abused her daughter to have contact with the children, Harris brought the children with her to prison to visit and possibly confront him about the abuse. In May 2000, another referral was made, alleging that Harris was frequenting a "crack house," exposing her children to that dangerous environment, spending time with another known sex offender, and allowing him contact with her children. The Department took custody of the three older children at this point and later proceeded to seek the termination of her parental rights.

At trial, Department caseworkers testified that in their dealings with her related to her older children, she was uncooperative and confrontational. The Department initially attempted to allow Harris visits with her older children twice a month, but caseworkers testified that Harris did not cooperate, sometimes refused to attend visitations unless all three children would be there, and once left a visit early because she believed her rights were being violated. However, Harris had also completed many of the court-ordered requirements, including two parenting classes, a drug and alcohol screening, and a psychological assessment, and attended Alcoholics Anonymous meetings. Caseworkers testified that Harris sometimes refused Department requests for drug testing, once tested positive for marihuana,[5] and admitted to smoking marihuana that one time; Harris and C.C.H. tested negative for illegal substances when C.C.H. was born. Caseworker Leslie Ontiveros testified that in May 2000, the police told her that Harris had gone to a "known crack house" and had brought her children to a house where a sex offender named Elvis Harris lived. Ontiveros believed that Elvis Harris, who was deceased at the time of trial, was related to Harris's husband's family, although Harris, her husband, and her father-in-law denied this. Although Elvis Harris was characterized as a known sex offender, Ontiveros admitted that his conviction "may have" occurred after Harris's children were removed, and Harris introduced records showing that Elvis

---

visitation with C.C.H. and that visitation would be "disruptive to his schedule as well as his caregivers['] schedule" and "emotionally problematic" for him.

4. The dissent seems to believe that by making this observation, we somehow are devaluing or disregarding the evidence related to Harris's interactions and treatment of her older children. This is not the case. We agree that Harris's conduct related to the older children is relevant in this cause. See In re S.F., 32 S.W.3d 318, 322 (Tex.App.-San Antonio 2000, no pet.). We simply make this observation to place the evidence in context.

5. Caseworker Leslie Ontiveros testified that Harris tested positive for marihuana once, but Kellie Ragland testified that she "believed" Harris had tested positive two or three times. However, Ragland did not have any records to show more than one positive test, and she testified that she would not be surprised if Ontiveros testified that there was only one positive test. Harris denied any positive tests other than the one test after she admitted to smoking a marihuana cigarette shortly after she learned of her daughter's outcry and her three older children were removed.

Harris was convicted in 2002, three years after the Department alleged endangerment because Harris had "exposed" her children to him and one year after her rights to her older children were terminated.

Scott Johnson, a San Marcos police detective, testified that he met Harris and her children in late 1999, after Harris's daughter made her outcry. He also dealt with Harris more recently, when the Department removed N.H. He said that he saw no signs that Harris had neglected or injured her children. He said that N.H. was clean and that Harris's house was "fairly well kept," although it looked like Harris was packing to move. Gayle Michalek, a licensed professional counselor who worked with Harris from August to December 2000, testified that Harris admitted to substance abuse starting in high school, but denied any recent use.[6] She also testified that Harris attended AA or NA meetings about three times a month.

Chris Farrell, another of Harris's therapists, met with her in February, March, and April 2001, starting very shortly after C.C.H. was born and removed from her care. Farrell testified that Harris told him that her mother was a drug addict when Harris was a child and that Harris had been in foster care when she was young. He testified that she was very angry, expressed violent thoughts toward the Department, and believed she was being persecuted by the Department. During their sessions, Farrell attempted to point out that Harris's anger and attitude toward the Department were not helping her regain custody of her children. Farrell thought he was building rapport and making progress with Harris, but after six sessions, she got angry and left when he

ran late with another client and never returned.

Farrell testified that Harris, who was working in a nursing home at the time, related a conversation she had with the daughter of a patient. The woman was angry and threatening, and Harris responded by reminding the woman "that her mother was in [Harris's] care." Farrell took this remark to mean that Harris was saying that "she could have hurt the woman's mother in retaliation for this woman calling [Harris] and threatening her." Harris then made what Farrell took to be similar threats towards Department caseworkers, saying they should hope never to be in a nursing home where Harris worked. Farrell said he was "shocked" to hear that level of anger and violence, saying that he was accustomed to clients being angry and venting about the Department with general remarks such as, "I'm so angry I could kill them." Farris, however, felt that Harris's remarks were very specific and showed him that Harris "was thinking in her mind about how she could hurt this woman's mother." Farrell believed Harris was "very angry" and violent, made poor choices for which she did not take responsibility, blamed others for her problems, and "retaliate[d] against others when they fail to conform to her wishes and desires." Farrell testified that during their fourth session he told Harris that he could be "subpoenaed to testify against her and use whatever confidential information she gave [him] against her."

Sherryl Boyd, the court-appointed special advocate for C.C.H., testified that he was happy and safe in his foster home with his siblings. She testified that he had not known any other home since his birth almost four years earlier. She also testified

6. Both Farrell and Michalek testified that Harris admitted to drug abuse in the past, but neither stated that she admitted to recent drug use. Michalek testified to the contrary, stating that Harris denied any recent drug abuse.

about some of the negative things the older children told her about living with Harris and said that the children told her that Harris was neglectful and violent and used drugs in front of them. C.C.H.'s foster mother, who with her husband has adopted the older three children, testified that C.C.H. was doing well in their home and was very attached to his oldest brother. She believed it was in his best interest to terminate Harris's rights so that he could be adopted into their family.

Cleiffort Cooks–Harris, Harris's estranged husband, denied that he or Harris used drugs or abused C.C.H. or N.H., their youngest son, and he felt that the Department was harassing him and Harris.[7] Cooks–Harris, who is African–American, testified that the Department got involved in his life only after he married Harris, who is Caucasian. At the time of trial, Cooks–Harris was in jail for violating Harris's protective order against him, which he thought had been removed, when he took care of N.H. in Harris's home while Harris worked. The protective order provided Cooks–Harris with visitation rights to N.H. and allowed Cooks–Harris and Harris to agree to additional visitation. However, the order bars Cooks–Harris from entering Harris's home; visitation must take place at another location. Cooks–Harris testified that Elvis Harris was not a relative, that Elvis's brother was married to one of Cooks–Harris's cousins, and that he never knew Elvis had been convicted of a sex crime. Cooks–Harris's father testified that he did not think Harris or his son used drugs. He also testified that the alleged crack house was instead a relative's home and that he never knew that Elvis Harris was a sex offender.

Harris's mother, Karen Bryant, testified that Harris had attended AA and NA meetings, got an AA sponsor, and did not abuse drugs or alcohol. She denied many of the Department's allegations, including allegations that she herself was a drug addict. Bryant denied any drug use and testified that her mother, Harris's grandmother, was an alcoholic and drug abuser and that Bryant herself was very opposed to drug use. She believed Harris was a good mother who tended to spoil her children but never neglected or abused them. She testified that she thought it was in C.C.H.'s best interest for him to be raised by Harris. Karen Rust, Harris's employer, testified that Harris had worked for her for more than two and one-half years, providing in-home care for elderly and disabled patients. She said that Harris was an excellent and professional care giver and that she had never received any complaints about Harris or reports that Harris had threatened a patient. Rust testified that Harris had described her dealings with the Department and told Rust that

---

**7.** The Department took custody of N.H. at some point, but the record is somewhat unclear as to exactly when that occurred. Caseworker Rodrigo Gonzales testified that the Department attempted to remove N.H. in 2002 but that the trial court found that the Department did not have grounds to remove the child. He also testified that in 2003 he responded to a report that N.H. had been slightly injured in a fight between Harris and Cooks–Harris (he was struck by a telephone cord when Cooks–Harris pulled the phone away from Harris), but that neglectful supervision referral was "ruled out" because Harris had taken N.H. and gone to a women's shelter and was properly protecting N.H. After that incident, Harris sent Gonzales a copy of the protective order she obtained against Cooks–Harris and a copy of a medical report showing that she brought N.H. to a doctor to be sure he was alright. The Department removed N.H. again three weeks before trial, presumably because Harris had allowed Cooks–Harris to babysit N.H. in Harris's home, in violation of the protective order. The record is unclear whether, at the time of trial, a termination action had been filed or whether N.H. was in the custody of Harris or the Department.

she thought the Department was "being overly aggressive and unfair." One of Harris's neighbors testified that he never saw any evidence of drug use by Harris or Cooks–Harris or any signs that N.H. was abused or neglected.

Taylor Skaar, a domestic violence counselor at a women's shelter, testified that Harris used the shelter "as a place to get help." Skaar said Harris had the paperwork to initiate a divorce and talked about taking N.H. and moving to get away from both Cooks–Harris and the Department but was also conflicted about whether to reconcile with her husband and abandon the protective order against him. Skaar did not find Harris to be delusional or paranoid and said Harris was angry and believed she was being abused by the Department. Skaar thought Harris struggled with "being poor, not having money, not having a support system, and still being required to take care of her child and to earn money." Skaar heard similar complaints from other women about the Department's requirements. Skaar had never viewed Harris as violent and could not imagine her threatening to harm anyone. She had seen Harris angry but never aggressive or "explosively" angry. Skaar testified that Harris did not direct her anger at her children or Skaar, but instead at the Department and the situation in which she felt trapped. Skaar testified that she never saw any signs that N.H. was abused or neglected, saying, "One thing I know for sure is that Ramona really cares about her child."

Harris testified and denied most of the Department's charges leveled against her in this and the earlier termination proceeding.[8] She admitted that when her daughter made her outcry of abuse by Harris's former boyfriend, Harris initially doubted the accusation because she thought her daughter, who was not always honest and was a "daddy's girl," was trying to drive Harris back to her ex-husband. She later came to believe the outcry and recognized that bringing her children to see the abusive boyfriend in jail was a poor choice. She testified that although she learned later that her boyfriend was on probation for robbery, she did not know that at the time. Harris denied telling Farrell that her mother was a drug addict. She further denied using crack cocaine but admitted to smoking marihuana once shortly after her daughter's outcry and her children's removal. She denied bringing her children to a crack house and testified that the alleged crack house was actually the home of Cooks–Harris's uncle where the Harris family socialized, and she, Cooks–Harris, and Cooks–Harris's father testified that the uncle was neither a drug dealer nor user.[9] She denied threatening anyone and said that her remark to Farrell meant that she thought the Department staffers should "remember the golden rule" and should be nice to people because "one day they might need you, and you might treat them the same way that they're treating you." She also said that Farrell told her that "it was best for [her] to just quit and give [her] children away"; after that remark, she felt he was not working for or helping her. She denied refusing to visit her children and said she "might have been late for a visit." Harris had worked

8. The dissent states that Harris did not controvert the final order of termination related to her older children. However, Harris denied most of the Department's allegations and testified that she was not a drug addict, had not knowingly exposed her children to a sex offender, and had attempted to comply with the Department's reunification plan.

9. Ragland testified that the Department did not do any investigation of whether the house was actually a "crack house" and that she did not know whether the police ever raided the house.

for the same care-giver agency for several years and made between $15,000 and $19,000 a year.

Harris testified that she attempted to vacate the protective order because she needed Cooks–Harris's help to babysit for N.H. She called the assistant district attorney who had helped her obtain the protective order and was told that the attorney "would look into it," which she thought meant the protective order would be dropped. She stated that she obtained the protective order after a fight with Cooks–Harris, but denied alleging that he had physically abused her. She said she called the police out of anger but then realized that the Department would try to take N.H. away from her. She said she went to the shelter for safety from the State, not from Cooks–Harris. She said she had filed for divorce from Cooks–Harris and although "to a degree" she was "wanting to reconcile," she and Cooks–Harris both testified that they intended to go through with the divorce. Harris also denied that she had "subjected" her children to a known sex offender. She testified that in 1999, when she heard that Elvis Harris might be a sex offender, she went to the Sheriff's Office to inquire, and was told that he was not included in the sex offender registry. Harris introduced evidence showing that not until 2002, well after her inquiry, was Elvis Harris convicted of a sex offense.

■ In determining the placement of a child, the child's best interest is the primary consideration. Tex. Fam.Code Ann. § 153.002; *Doyle v. Doyle,* 955 S.W.2d 478, 479 (Tex.App.-Austin 1997, no pet.). In making that determination, the fact-finder is to consider the following factors: the child's desires, the child's present and future emotional and physical needs, emotional and physical danger posed to the child now and in the future, the parenting abilities of the individuals seeking custody, programs available to assist the would-be parents, the individuals' or agency's plans for the child, the stability of the proposed homes, any acts or omissions by the parent that might show an improper parent-child relationship, and any excuse for such acts or omissions. *Holley v. Adams,* 544 S.W.2d 367, 372 (Tex.1976).

Most of the Department's evidence related to Harris's behavior with her older children, and the jury could have determined that leaving C.C.H. in the Department's care would be in C.C.H.'s best interests. However, the jury did not make that finding. Instead, it found that naming Harris as managing conservator would best serve the child's interests. That decision only needed to be, and was, supported by legally sufficient evidence.

It was not the trial court's role to reweigh the evidence; the court was instead limited to ensuring that some credible evidence supported the jury's findings. *See* Tex. Fam.Code Ann. § 105.002(c)(1). Aside from stating that the jury's finding in favor of Harris was "against the greater weight and degree of the credible evidence," however, the trial court made no findings of fact and provided no details of the manner in which the jury's finding was unreasonable or unsupported by legally sufficient evidence. Nor did the court find that naming Harris as managing conservator would significantly impair C.C.H.'s physical or emotional well-being. *See id.* § 263.404(a)(1). Further, the trial court was not empowered to disregard the jury's verdict merely based on *factual sufficiency;* the court could only controvert the verdict if it found the verdict was not supported by *legally sufficient* evidence. *See* Tex. Fam.Code Ann. § 105.002(c); *Lenz,* 79 S.W.3d at 19–20. However, by its finding that the jury's verdict was "against the greater weight and degree of the credible evidence," the trial court

made a finding that the verdict was against the preponderance of the evidence. *See, e.g., Columbia Rio Grande Reg'l Healthcare, L.P. v. Hawley*, 188 S.W.3d 838, 864 n. 4 (Tex.App.-Corpus Christi 2006, pet. filed) ("preponderance of the evidence" is defined in Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Malpractice, Premises, & Products* PJC 40.3 (2003), as "the greater weight and degree of credible evidence"). Thus, the trial court made it clear that it conducted a factual-sufficiency review, not a legal-sufficiency review. *See Long v. Long*, — S.W.3d —, —, No. 08–05–00250–CV, 2007 Tex.App. LEXIS 1111, at *6, 2007 WL 475794, at *2 (Tex. App.-El Paso Feb. 15, 2007, no pet. h.) (to establish error, wife "must challenge that the characterization is against the great weight and preponderance of the evidence [a factual sufficiency complaint] or that separate property status was established as a matter of law [a legal sufficiency complaint]"). This overstepped the trial court's proper role in reviewing the jury's verdict.

Harris has had stable employment for a significant period of time. She denied using crack cocaine, one of the allegations frequently leveled against her by the Department, had never tested positive for cocaine, and produced testimony by several witnesses that they had never seen her using cocaine or acting as if she were under the influence of an illegal drug. Harris produced testimony that when N.H. was in her care, he was well cared for and not neglected or abused. Although it is true that C.C.H. has been in his foster home since his birth and has not had visitation with Harris, it was the Department's decision to deny all visitation that resulted in the lack of contact between C.C.H. and his mother. There was no evidence of any improper behavior by Harris directed at or related to C.C.H., and Harris and her witnesses denied most of the Department's allegations related to her older children. It was for the jury, as sole judge of the credibility of the witnesses, to weigh the credibility, decide any evidentiary conflicts, and determine the weight to be given the evidence. *See City of Keller*, 168 S.W.3d at 819–20. When the jury examined the evidence, it was obligated to consider the rebuttable presumption that C.C.H.'s best interest would be served by allowing Harris, his natural parent, to raise him. *See* Tex. Fam.Code Ann. § 153.131; *Lewelling*, 796 S.W.2d at 167 ("It is no longer adequate to offer evidence that the nonparent would be a better custodian of the child."). We cannot hold that the jury acted unreasonably in reaching its factual determinations. *See City of Keller*, 168 S.W.3d at 819–20, 822–23.

Certainly this is a difficult case with no easy answers. C.C.H. has been in a comfortable home with his siblings since birth. However, he has also been denied contact with his natural parent since October 2001, and this lack of contact is a result of Department decisions, not Harris's decisions or conduct since the October 2001 trial or any indifference on her part. *See Lewelling*, 796 S.W.2d at 168 n. 9. We agree with the dissent that the evidence related to C.C.H.'s best interest "was sparse," but this is in part due to the Department's decision to deny Harris any contact with him since October 2001. Further, it was misconduct by Department witnesses that caused the first trial of this case to end in a mistrial, which has extended the delay in resolving this matter.[10] Harris may be difficult for the Department

---

10. The record reflects that during the first trial of this issue, one of the Department's witnesses broke rule 267 of the rules of civil procedure by talking to Department witnesses who had not yet testified. As a result, the trial court declared a mistrial.

to work with but that cannot be grounds for cutting off contact between a child and his natural parent whose rights have not been terminated.

The dissent spends a great deal of time discussing the evidence that would support a finding of termination and the standards and statutes that apply to a finding of termination. However, in this case, the jury found and the trial court agreed that Harris's parental rights *should not be terminated.* We must ask only whether there was any evidence on which the jury could base its decision to award managing conservatorship to Harris, but instead, the dissent conducts a result-oriented inquiry, bending the standards of review in order to reach a decision more palatable to the dissent.[11] We may not act in such a result-oriented manner and instead must conform our inquiry to the standards set out in the family code and by the supreme court. We may not substitute our judgment for that of the jury on matters of evidentiary conflict and must apply the law the same in this case as we would in any other.

Finally, we take great issue with the dissent's assertion that because Harris's rights to her older children were terminated, the "undisputed evidence"[12] "conclusively establishes a ground for termination that supports the trial court's disregard of the jury finding." The dissent goes on to say that "[b]ecause this evidence also constitutes undisputed evidence that Harris's parental relationship endangered the safety of her children and that termination was in their best interest, it is conclusive as well on the finding of best interest as it relates to the issue of C.C.H.'s conservatorship." (Citations omitted.) The dissent's approach would mean that once a parent commits an act permitting termination, there is no need to conduct further inquiry into best interest, something section 161.001(2) specifically requires. Further, this would mean that if a parent ever has his or her parental rights terminated, even if it occurred ten years earlier or was based on false testimony, that parent's parental rights to other children could be terminated without any factual inquiry at all. Even if his or her rights were not terminated, the parent could never hope to regain conservatorship. This misguided approach would drastically alter the termination statutes' provisions and would shift the burden of proof to parents defending themselves against termination cases, rather than requiring the State to show by clear and convincing evidence both grounds for termination and the child's best interest. *See* Tex. Fam.Code Ann. § 161.001 (West Supp.2006); *In re C.H.,* 89 S.W.3d 17, 23 (Tex.2002).

### Conclusion

Because legally sufficient evidence supported the jury's finding that it was in

---

**11.** The dissent agrees that we must review the evidence under a legal-sufficiency standard but then goes on to conduct a factual-sufficiency review. The dissent states that *"even when considered in the light most favorable to Harris,* the evidence supports the trial court's presumed finding."* (Emphasis added.) Thus, the dissent makes it clear that its primary approach is not to view the evidence as required but instead to re-weigh the evidence in a light favorable to the trial court, not the jury's verdict. The dissent states that "[w]e may not allow a determination of the best interest of the child to turn on personal pref- erences, speculative concepts of proper child rearing, or who 'deserves' the child," but this is exactly the kind of analysis the dissent then employs, showing its disfavor for Harris, her lifestyle, and her attitude toward the Department.

**12.** Although it is undisputed that Harris's parental rights to her three older children were terminated, Harris and her witnesses testified in opposition of much of the Department's evidence and allegations supporting the termination of her older children.

C.C.H.'s best interest for Harris to be named sole managing conservator, the trial court erred in contravening that finding and instead naming the Department as managing conservator. We reverse the trial court's order and render judgment in conformity with the jury's finding that Harris should be named C.C.H.'s managing conservator.

Dissenting Opinion by Justice PATTERSON.

JAN P. PATTERSON, Justice, dissenting.

I agree that the trial court may not contravene the jury's finding on the issue of the appointment of the sole managing conservator. *See* Tex. Fam.Code Ann. § 105.002(c)(1)(A) (West Supp.2006).[1] But this does not relieve us from our role in reviewing the jury's verdict for legal sufficiency. Because the jury's verdict is legally insufficient, it is error to reverse the trial court's order disregarding that verdict and render judgment removing this child from foster parents with whom he has spent the last six years and sending him straightaway to a parent with whom he has spent only a handful of hours.[2] Having lingered in foster care for six years while the legal process determines whether he will remain with his foster parents, who have adopted his two older brothers

and sister, this child must be the paramount focus here: What is in the child's best interest? Legal proceedings have immutably altered his life. Were we writing on a clean slate, we would hope to provide this child—and his parent—with what the legislature contemplated: a fair and expeditious proceeding with security, continuity, stability, certainty, and finality at its conclusion. But the slate is not clean.

After a trial in October 2001, this Court in April 2003 affirmed the termination of Harris's rights to her three other minor children, M.H., C.D., and K.D.[3] The Department alleged and proved that the parents:

> Knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children in violation of Tex. Fam.Code Ann. § 161.001(1)(D) (West 2002), and Engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical and emotional well-being of the children in violation of Tex. Fam.Code Ann. § 161.001(1)(E) (West 2002).

*See* Tex. Fam.Code Ann. § 161.001(1)(D)-(E). This Court observed that the rights of Ronald Williams, M.H.'s father, were terminated, but he did not appeal; nor had Steven Dietrick, the father of C.D. and

---

1. This is an accelerated appeal pursuant to family code section 263.405(a). *See* Tex. Fam.Code Ann. § 263.405(a) (West Supp. 2006) (since September 1, 2001, an appeal from a final order terminating the parent-child relationship and appointing another as managing conservator is accelerated and governed by the rules for accelerated appeals in civil cases); *see also In re J.L.*, 163 S.W.3d 79, 81–82 (Tex.2005). A final order was entered in April 2005, and Harris appealed to this Court that same month.

 For reasons not explained in the record, Harris's counsel did not include the Department's original petition in the record before

us and seems to be under the mistaken impression that this appeal arises from Harris's own petition to modify the parent-child relationship with respect to C.C.H. and not from the Department's petition to terminate parental rights.

2. There is an indication in the record that Harris had some visits with the child at the time of trial. For reasons not in the record, Harris was generally denied visitation.

3. *Harris v. Texas Dep't of Protective & Regulatory Servs.*, No. 03–01–00643–CV, 2003 Tex. App. LEXIS 2842, 2003 WL 1738390 (Tex. App.-Austin Apr.3, 2003, no pet.) (mem.op.).

K.D., or Cleiffort Cooks–Harris, whose rights were terminated as to the child, C.C.H., who is the subject of the current proceeding. *Harris v. Texas Dep't of Protective & Regulatory Servs.*, No. 03–01–00643–CV, 2003 Tex.App. LEXIS 2842, at *3–4, 2003 WL 1738390, at *1 (Tex.App.-Austin Apr.3, 2003, no pet.) (mem.op.). The status of C.C.H. was not at issue in the prior appeal.[4] Among the issues in the prior appeal was Harris's motion for continuance which the trial court had overruled. This Court noted that the appeal was controlled by then recently enacted procedures requiring a finding by the trial court regarding the merits of the appeal[5] and that the "case was a little over a month away from dismissal under an already extended deadline." *Id.* When Harris sought a continuance, the Department urged that a continuance raised the risk that the case would not be heard in time for the statutory deadlines to be met, thereby resulting in its dismissal. In her second issue, Harris contended that the case of each of the three fathers should be severed and separated into a different cause and tried separately. This Court rejected the issues and affirmed the termination of Harris's parental rights to her three older children on the grounds of family code sections 161.001(D) and (E).

The instant appeal arises from the severed cause involving the termination of Harris's parental rights as to C.C.H. The Department alleged the following three grounds for termination of Harris's parental rights as to C.C.H.:

That Harris knowingly placed or knowingly allowed C.C.H. to remain in conditions or surroundings which endanger the physical or emotional well-being of the child in violation of section 161.001(1)(D);

That Harris engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of C.C.H. in violation of section 161.001(1)(E); and

That Harris had had her parent-child relationship terminated with respect to another child based on a finding that her conduct was in violation of section 161.001(1)(D) or (E) in violation of section 161.001(1)(M).

*See* Tex. Fam.Code Ann. § 161.001(1)(D)-(E), (M) (West Supp.2006). At the end of a contentious trial, the court instructed the jury that, for the parent-child relationship to be terminated, one of the grounds must be proven by clear and convincing evidence and, further, that the jury must find that the termination is in the best interest of the child. *See id.* § 161.001. In a second question to the jury, the charge inquired whether the Department or Harris should be designated the permanent managing conservator; the jury was instructed that the answer to the question should be based upon a preponderance of the evidence.

After the jury returned a verdict finding that Harris's parental rights to C.C.H. should not be terminated and that Harris should be named managing conservator, the Department filed a motion for new trial on the ground that the jury's answer to the managing conservator question was against the great weight and preponderance of the evidence, manifestly unjust, and not in the child's best interest. The

---

4. For reasons not in the record, Harris's parental rights as to C.C.H. were severed and tried separately and are now the subject of this separate appeal.

5. *See* Tex. Fam.Code Ann. § 263.405(b), (d) (West Supp.2006) (*enacted by* Act of May 22, 2001, 77th Leg., R.S., ch. 1090, § 9, 2001 Tex. Gen. Laws 2397, 2397–98, effective Sept. 1, 2001, *amended by* Act of May 12, 2005, 79th Leg., R.S., ch. 176, § 1, 2005 Tex. Gen. Laws 332).

Department sought a new trial in the interest of justice and fairness. On behalf of the child, the attorney ad litem[6] filed a motion to designate the Department as managing conservator. Citing the best interest of the child, C.C.H.'s attorney reminded the court that Harris's parental rights to her three older children had been terminated on endangerment grounds, that Harris's therapists had testified that she admitted to a history of alcohol and drug abuse, that she had a history of associating with and having relationships with individuals with criminal records, that the parental rights of the child's father had been terminated and he had been jailed for violating a protective order, that both parents had violated the protective order leading to the father's incarceration, and that the child had lived his entire life in the home of foster parents who had adopted his three older siblings. C.C.H.'s attorney urged that the Department be named sole managing conservator for the sake of the child's safety and well-being, and that Harris be named possessory conservator.

At a hearing held on April 1, 2005, the court set aside the jury's finding on the issue of conservatorship and, in accordance with the attorney ad litem's motion, appointed the Department as the sole managing conservator of the child. The trial court entered a final order confirming the jury's finding that Harris's parental rights were not terminated and concluding that the jury's finding that Harris be named sole managing conservator instead of the Department was against the great weight of the evidence and not in the best interest of the child. Specifically, the court rendered the following order:

> The Court orders that the finding of the jury that it is not in the best interest of the subject child that the Department of Protective and Regulatory Services be named Managing Conservator of said child is against the greater weight and degree of the credible evidence herein and is not in the best interest of the subject child, and such finding is set aside.

On appeal, Harris attacks the trial court's order by first contending that this case was brought by Harris as petitioner in a suit to modify the parent-child relationship, that the "Department never made any affirmative pleadings or requests for relief in this action," and "never [re]quested termination in this case."[7] If, however, this were an appeal from Harris's petition to modify, she would have had the burden to show that the modification was in the best interest of the child and that the circumstances of the child, the conservator, or another party affected by the order had materially and substantially changed since the rendition of the order. *See id.* § 156.101 (West Supp.2006). Contrary to Harris's assertion, this appeal arises from a suit for termination of parental rights. Because Harris never addresses the issues as they relate to the petition to terminate and fails to include the petition and appropriate citations to authorities and to the

---

6. At a hearing for the purpose of rendering a final order on March 18, 2005, the attorney ad litem was not present and had notified the court that he was seriously ill and would be unable to attend. Harris's attorney objected to any further postponement and observed that the attorney had not filed any post-trial motions. In fact, the attorney ad litem's motion to designate the Department as managing conservator of the child was filed on the date of the hearing. In any event, on April 1, 2005, a second attorney ad litem was substituted for the original attorney ad litem, who died in July 2005. The record does not show that the second attorney ad litem ever appeared in a proceeding.

7. Perhaps this is the reason Harris failed to include the Department's petition for termination as to the four children—but severed as to C.C.H.—in the record on appeal. *See supra* note 1.

record, I would hold first that she has not preserved error and does not present anything for review. *See* Tex.R.App. P. 38(h).

The cynosure of Harris's appeal and the majority opinion is that the trial court erroneously disregarded the jury's answer to question two by naming the Department as managing conservator in violation of section 105.002 of the family code. To be sure, section 105.002 requires the trial judge to abide by the jury's determination on the issue of managing conservatorship. Tex. Fam.Code Ann. § 105.002. The court may not enter a judgment notwithstanding the verdict. *Lenz v. Lenz,* 79 S.W.3d 10, 20 (Tex.2002). But that is not the end of our review. The jury finding is binding upon the court only when supported by the evidence as in any other civil action where the parties have a right of trial by a jury. *Id.; see also In re Rodriguez,* 940 S.W.2d 265, 271 (Tex.App.-San Antonio 1997, writ denied); *Fambro v. Fambro,* 635 S.W.2d 945, 947 (Tex.App.-Fort Worth 1982, no writ).

Thus, the appropriate challenge must be directed to a traditional sufficiency review: Is the evidence legally and factually sufficient to support the jury's finding that appointing Harris as the child's managing conservator was in his best interest? *Lenz,* 79 S.W.3d at 16–17. Recognizing the strong presumption that the best interest of the child is generally served by preserving the parent-child relationship and giving the jury's decision substantial deference in accordance with our standards of review, I would hold that the evidence is legally insufficient to support the jury's verdict and, instead, supports the trial court's disregard of the jury's finding regarding managing conservator.

In determining the issue of conservatorship, "[t]he best interest of the child shall always be the primary consideration." Tex. Fam.Code Ann. § 153.002 (West 2002). Although the majority sets forth the appropriate standard for a legal sufficiency challenge to the question of conservatorship, it fails to examine the evidence as it relates to the best interest of the child. Because the evidence regarding termination also contemplates the best interest of the child, *see* Tex. Fam.Code Ann. § 161.001(2), it bears a substantial relationship to the trial court's disregard of the jury's finding on conservatorship. *In re J.F.C.,* 96 S.W.3d 256, 264–65 (Tex. 2002).

One of the three grounds alleged by the Department was that Harris's parent-child relationship was terminated with respect to another child based on a finding that her conduct violated section 161.001(1)(D) or (E) in that she knowingly placed or allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child, or she engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. *See* Tex. Fam.Code Ann. § 161.001(1)(M). A court may order termination if the factfinder finds by clear and convincing evidence that the parent-child relationship was terminated with respect to another child based on a finding of child endangerment under section 161.001(1)(D) or (E) or a substantially equivalent provision of another state's law. *Id.* When a prior decree of termination as to another child is properly admitted into evidence, the Department is not required to re-establish that the parent's conduct with respect to that child was in violation of section 161.001(1)(D) or (E). *In re J.M.M.,* 80 S.W.3d 232, 243 (Tex.App.-Fort Worth 2002, pet. denied). The Department need only show that the parent's rights were terminated as to the other child based on the appropriate findings. *Id.* at 242–43; *see also* Tex. Fam.Code Ann. § 161.001(1)(M). Thus, section 161.001(1)(M) is a separate and independent ground for termination:

The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:

(1) that the parent has: ...

 (M) had his parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law in another state.

Tex. Fam.Code Ann. § 161.001(1)(M).

The Department introduced into evidence a certified copy of the final order dated November 14, 2001, terminating Harris's parental rights to other children. Harris did not controvert this evidence. This evidence thus constitutes undisputed conclusive evidence of a violation of section 161.001(1)(M). *See City of Keller,* 168 S.W.3d at 815–16. We may not disregard it. *See Provident Am. Ins. Co. v. Castaneda,* 988 S.W.2d 189, 190 (Tex.1998). We must consider undisputed evidence that does not support the verdict and set aside the jury's determination if we find the jury's decision to be unreasonable *or* we find undisputed evidence that does not support the jury's decision. *See City of Keller,* 168 S.W.3d at 821 (if the evidence allows only one inference, we may not disregard it). Likewise, we may not disregard the legislative choice to provide in the statutory scheme section 161.001(1)(M) as a ground for termination.[8] The undisputed evidence that Harris's parental rights to other children had been terminated conclusively establishes a ground for termination that supports the trial court's disregard of the jury finding. Because this evidence also constitutes undisputed evidence that Harris's parental relationship endangered the safety of her children and that termination was in their best interest, *see* Tex. Fam.Code Ann. § 161.001(2) (in termination proceeding, court must find termination is in the best interest of the child), it is conclusive as well on the finding of best interest as it relates to the issue of C.C.H.'s conservatorship.[9] For

8. Hence, the majority observes that most of the Department's evidence related to Harris's behavior with her older children because the Department removed C.C.H. the day after his birth. A finding of parental conduct endangering a child may also be based on the parent's conduct with regard to the child's siblings prior to the child's birth. *See, e.g., Dallas County Child Protective Servs. Unit v. Bowling,* 833 S.W.2d 730, 733–34 (Tex.App.-Dallas 1992, no writ) (sexual abuse of oldest son before birth of child in question was evidence of course of conduct that endangered younger child); *Clark v. Clark,* 705 S.W.2d 218, 219 (Tex.App.-Dallas 1985, writ dism'd w.o.j.). A petition to terminate may be filed before a child is born. Tex. Fam.Code Ann. § 161.102 (West 2002). Conduct that occurred before the child's birth may be considered in determining whether a parent has endangered a child. *In re S.F.,* 32 S.W.3d 318, 322 (Tex.App.-San Antonio 2000, no pet.); *In re M.J.M.L.,* 31 S.W.3d 347, 351–53 (Tex.App.-San Antonio 2000, pet. denied). Moreover, conduct directed at another child may be sufficient to demonstrate a course of conduct that endangered a child's emotional well-being even if the abusive conduct was not committed in the child's presence. *E.g., In re B.B.,* 971 S.W.2d 160, 169 (Tex.App.-Beaumont 1998, pet. denied); *Lucas v. Texas Dep't of Protective & Regulatory Servs.,* 949 S.W.2d 500, 503–04 (Tex.App.-Waco 1997, writ denied) (father endangered all his children when he sexually assaulted one of them). Even apart from the evidence involving other children, however, the termination of another child and its proof at this trial is conclusive evidence of a ground for termination under section 161.001(1)(M).

9. In a suit for termination of parental rights, family code section 161.205 authorizes the court to either deny the petition or render any order in the best interest of the child. Tex. Fam.Code Ann. § 161.205 (West 2002). Moreover, section 263.404 expressly authorizes the trial court to enter an order appointing the Department as managing conservator without terminating parental rights if the trial court finds that appointment of a parent as managing conservator would not be in the

this reason, the evidence relating to grounds for termination is relevant to the issue of conservatorship. But I will nevertheless examine separately the evidence relating to C.C.H.'s best interest.

Appellant asserts that the trial court failed to address the issue of the best interest of the child in its final order. A consideration of the best interest of the child must be viewed in light of the various factors that cabin the jury's and trial court's determinations. The charge instructed the jury to consider the *Holley* factors in determining the best interest of the child. *See Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976). These factors include the desires of the child; the emotional and physical needs of the child, now and in the future; the emotional and physical danger to the child, now and in the future; the parenting ability of the individuals seeking custody; the programs available to assist those individuals to promote the best interest of the child; the plans for the child of those individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent. *See id.* In 1993, the legislature codified those factors identified in *Holley* and incorporated additional factors for courts to consider when reviewing the placement of children under the care of the Department. *See* Tex. Fam.Code Ann. § 236.307 (West 2002). Section 263.307 provides the following factors for determining the best interest of the child:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

best interest of the child's because it would significantly impair the child's physical health or emotional development. *Id.* § 263.404(a) (West 2002). In light of the jury's decision not to terminate Harris's parental rights, the trial court's disregard of the jury's finding on

conservatorship and presumed finding that it was not in the best interest of C.C.H. to appoint Harris as managing conservator comports with the court's authority under sections 161.205 and 263.404.

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

 (A) minimally adequate health and nutritional care;

 (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

 (C) guidance and supervision consistent with the child's safety;

 (D) a safe physical home environment;

 (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

 (F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.*

Under a legal sufficiency review, we review the evidence in the context of these factors, considering as we must only the evidence and inferences tending to support the jury's finding and disregarding all evidence and inferences to the contrary. Noticeably absent from Harris's proof—and the majority opinion—is any evidence relating to the child's best interest.

In a glancing reference to the child's best interest, the majority references the rebuttable presumption that it is in C.C.H.'s best interest to be raised by his natural parent, Harris's assertion that she had stable employment for over two years, Harris's denial of drug use, and testimony by witnesses that they had never seen Harris use drugs or act as though she was under the influence of an illegal drug. Indeed, the testimony regarding what was in

C.C.H.'s best interest was sparse. The record shows that Harris never testified to what would be in the child's best interest; rather, she testified generally that she did not believe the foster parents, the CASA volunteer, and the guardian ad litem were acting in the child's best interest.

But there was ample testimony contrary to the jury's finding to support the trial court's disregard of that finding. Leslie Ontiveros, a supervisor of investigations for Child Protective Services for Hays and Caldwell Counties, testified that she first became involved with the family in October 1999. The Department had received a referral for the sexual abuse of C.D., Harris's seven-year-old daughter, by Harris's then boyfriend, Danny Gonzales. C.D. made an outcry statement to a teacher. But Harris did not believe her daughter and accused her of "making the story up." During her testimony, Harris acknowledged that she did not think the accusations were legitimate and that C.D. was not honest. She thought C.D. was probably mad because Harris had left C.D.'s father and C.D. was a "daddy's girl." When confronted with the "story," Gonzales did not protest the allegations and later pleaded guilty to indecency with a child, to wit, C.D.[10] Harris acknowledged that she took the children, including C.D., to jail to visit Gonzales once or twice. She agreed it was a poor choice, but she "wanted answers" and thought Gonzales was the one who could provide them. Harris thought it would be safe to take the children to the jail because jailhouses are safe and she couldn't find anyone to keep the children.

Testifying on her own daughter's behalf, Karen Bryant, Harris's mother, testified that she and Harris thought C.D. had also been abused by Harris's first husband as well because C.D. "was exhibiting some

---

10. The plea bargain agreement and judgment and sentence were introduced into evidence.

behaviors" that appeared to be from abuse. Bryant testified that Harris had been abused as a child by Bryant's second husband and had been to numerous therapists and counselors.

The Department received a second referral for neglectful supervision of the three children in May 2000. Ontiveros testified that she received information from law enforcement that Harris frequented a known crack house in San Marcos and that a sex offender also resided at the residence. Ontiveros tried to visit with the children at school, but one had been suspended and the other could not be located at school on that day or the next. C.D. confirmed to Ontiveros that Harris allowed the children to have contact with the known sex offender. At trial, Harris introduced evidence that the sex offender was not convicted until 2002. Although Ontiveros testified that Harris was cautioned about him earlier, Harris testified that she should not be charged with knowledge of his sex-offender status prior to his conviction. Ontiveros testified that when she received information that Harris was visiting a known crack house and had friends over to her residence to use crack, she went by Harris's house to check on the children. After speaking with the children, Ontiveros removed the children when Harris refused a drug test.

Ontiveros acknowledged that Harris tested positive for marijuana on one occasion, and that she was uncooperative and refused to be tested on numerous occasions. Harris did not believe she had a drug or alcohol problem and was resistant to participating in drug and alcohol screening and treatment. Harris participated in some psychological counseling, parenting classes, and visits with her children, but she failed to complete her therapy and did not follow through on her visits with the children. Ontiveros testified that "[s]he was very confrontational in my dealings

with her" and was angry that CPS was involved.

Harris's third husband, Cleiffort Cooks–Harris, whose parental rights to C.C.H. were terminated in 2001, testified that Harris obtained a protective order against him in January 2004 and that he had been arrested on two occasions for violating the order. The order arose out of a dispute between Cooks–Harris and Harris over his involvement with another woman and Harris taping his telephone calls with the woman. There was a physical altercation, Cooks–Harris pulled the telephone out of the wall, and Harris called the police and left to stay in a woman's shelter. A CPS investigator testified that Cooks–Harris pulled the telephone away from Harris, causing the cord to break and pull from the wall, and causing an injury to one of the children. Cooks–Harris complained that Harris pulled his hair out. Harris decided to file for divorce and to obtain a protective order. The order included the following findings:

> The Court finds that the Respondent has committed family violence against a member of the household and that family violence is likely to occur in the foreseeable future.
>
> The Court finds there is a clear and present danger that acts of family violence will be committed in the future.
>
> The Court finds that the Applicant and/or other members of the family or household will suffer immediate and irreparable injury, loss or damage for which there is no adequate remedy at law.
>
> The Court finds that the ... Protective Orders are necessary for the prevention of family violence and are for the safety and welfare and in the best interest of the Applicant and for the protection of the minor children and other members of the family or household.

Cooks–Harris testified that from time to time he would babysit for Harris when she needed a babysitter. He was arrested twice for violation of the order and was in jail at the time of trial. In addition, Cooks–Harris had a 1981 conviction for aggravated assault, was unemployed, and had a prior protective order entered against him in 1992. He testified that he was unaware of the reason for the protective order, that perhaps his wife would know.

In her testimony, Harris testified that she called the police because her husband "challenged" her and obtained the protective order as a consequence of her anger. She had filed for divorce from Cooks–Harris and acknowledged that she would invite him to babysit despite the protective order, which she claimed she had tried to lift. Harris explained that "I was more afraid of the State than I was my own husband" and she was scared CPS "was coming."

Kelly Ragland, a CPS investigator in the conservatorship unit who replaced another worker with whom Harris had a difficult relationship, testified about efforts to reunite the family. Ragland described her efforts to keep Harris involved with therapy, drug and alcohol treatment, and visits with her children despite Harris's resistance to therapy, and "oppositional" and confrontational approach to CPS involvement. Ragland testified about her numerous efforts to have Harris attend therapy and visit her children:

I would call the house to let her know things like the children had been moved from one placement to another or to let her know that we had visits scheduled for her. She would hang up the phone on me, she would tell me not to call her home anymore. Mr. Harris would get on the phone and say that we were never to call their home. I would send letters to the house to try to explain, you

know, what needed to happen as far as what she needed to do. And she would occasionally call me back and she would leave me messages yelling on the phone. It was very, very difficult to work with Mrs. Harris.

Ragland testified that Harris initially refused to visit with the children unless they were all present, which was difficult because, at the beginning, they were each in different foster homes or treatment centers. When Ragland could arrange to have all four children present at the same time, Harris would then visit. On one occasion when Ragland had "finally accomplished visitation," she observed Harris explain to K.D. that he would have to testify in court. Ragland explained to Harris why this interaction was harmful to the children and left the room to observe her behavior from another room. Harris then showed K.D. a wedding photograph of her new husband, Cooks–Harris, to which K.D. expressed surprise. Ragland explained to Harris that she should discuss these matters with a caseworker before springing them on the children. When a caseworker questioned her conduct, Harris told her eldest child, M.H., that her rights were being violated, and Harris left the visit early. K.D. began crying, and M.H. tried to comfort him.

Ragland testified that she concluded Harris was not making an effort to visit with her children. Because setting up meetings by telephone became difficult and Harris would hang up on caseworkers seeking to set up visits, CPS began sending letters. On one occasion, at Harris's request, CPS had arranged for Harris to be transported by a CASA volunteer to the treatment center in another city where her daughter, C.D., was located. When Harris failed to appear for the trip, CPS learned that Harris had traveled to the treatment center and had an unsupervised visit with C.D. the day before.

On another occasion, Harris arrived with birthday presents for C.D., but left with the presents at the end of the visit. Harris testified that she did not want the gifts to be stolen while C.D. was residing at the treatment center. Similarly, at Christmas, Harris presented the children with gifts only to pack them up at the end of the visit, explaining that they could have them when they came home.

On two separate occasions, CPS hired security for visits based on threats from Cooks–Harris. Ragland testified that she was present when Cooks–Harris threatened a worker. Ragland also testified that Harris failed to submit to drug tests and availed herself of visiting opportunities only two or three times during the course of six to eight months even though she was allowed visits twice monthly. On cross-examination, Ragland testified that, although she never saw Harris physically harm the children, she observed Harris interact with her children in a way "that was harmful to their emotional well-being." Ragland testified that Harris was one of the most difficult parents to work with in terms of trying to get her to follow through with recommendations and having appropriate interactions with her children when she did visit with them. Ragland concluded that C.C.H. should be removed at birth because the risk to C.C.H. was too great and risk factors in the home had not been reduced to the point where the child could be safely maintained in the home.

One of Harris's therapists, Chris Farrell, testified that Harris had "gone through" three caseworkers and three therapists by the time he became involved. She failed to show up for her first two appointments, and she did not call. When she appeared for her third appointment, she was angry. Farrell described Harris as self-absorbed with narcissistic and paranoid personality disorder. At one session, after an angry and confrontational ex-

change, Harris stated, "I'm always angry." Harris made threats against CPS and warned that "they better hope they never end up in a nursing home" where she worked. Harris told Farrell of a woman who called her at the nursing home and made "threats." Harris threatened "back," reminding her that the woman's mother was in Harris's care. On one occasion when Farrell advised Harris he would be ten minutes late in ending a session with another patient, Harris angrily walked out and slammed the door. Farrell discussed Harris's lack of cooperation with Kelly Ragland. Harris told Farrell that Cooks–Harris had made a decision to ignore a court order to undergo paternity testing and that she supported his decision. Harris failed to conclude the assessment portion of her therapy and dropped out short of the nine sessions cited by the majority. On the date of her last appointment, Harris failed to show up or call, and she never returned. Farrell terminated her sessions for noncompliance.

Farrell testified that he was "shocked" at Harris's potential for violence and concerned about her lack of cooperation with therapy. He concluded she was a very dangerous and violent woman, had made threats against others, and that he could not ensure the safety of her children. Accordingly, Farrell recommended termination of Harris's parental rights due to the violent nature of her personality: "She talked about breaking people's legs." Farrell testified, "I would say that with a woman with this level of anger and rage within her anything is possible," and that Harris would not take responsibility for her actions and was entrenched in her world view. Farrell explained that Harris's sexual abuse as a child was a significant aspect in her developmental history and that it was also relevant that her mother had abused drugs, Harris grew up in foster care and had an extensive amount

of therapy and counseling throughout her life, her sisters were also sexually abused and had abused drugs, and her most recent husband abused drugs. Farrell felt he was making progress with Harris at the time she discontinued her sessions.

Gayle Michalek, Harris's licensed professional counselor for the period of August to December 2000, testified that she had seen a worrisome pattern of behavior by Harris and was concerned that Harris had not taken responsibility for the problems that had occurred in the case. Michalek was very concerned about the children returning home and that Harris had regressed in her treatment rather than making progress. Michalek was concerned that Harris was not stable, was not participating adequately in drug and alcohol counseling, and had not complied with Department-requested drug testing. Michalek was also concerned that Harris blamed her eight-year-old daughter for her "sexualized behavior" and that she was "all over" Gonzales and may have initiated some of the sexual activity. Michalek agreed, however, that Harris was not physically abusive nor an uncaring mother.

Sherryl Boyd, the guardian ad litem and court-appointed special advocate for all of the children beginning in 2002, testified that she was appointed to make recommendations to the Court about the welfare of the children and what was in the children's best interest. She described the change in the children and the progress they made when they were removed to their "permanent" foster care family. Boyd testified that their environment was now meeting their needs and that their best interests were being served in their new surroundings. C.C.H.'s siblings had been adopted by the family with which he lived, he was thriving, and he "could not be in a better place." Their home was calm, comfortable, and well-kept. Boyd explained that it is not a fancy home but a loving and wholesome situation. The children are close to each other and love their parents. The children had described to Boyd the fighting, drinking, and drug use that occurred in the Harris household and that it had been M.H.'s primary responsibility to take care of K.D.—to change his diapers, feed him, and clean up. Because Harris often worked at night and slept during the day, there was no one to take care of K.D. M.H. told Boyd that Harris had a bad temper and often hit him. On cross-examination, Boyd acknowledged that she had never seen the children interact with Harris.

C.C.H.'s foster mother and the mother of C.C.H.'s three siblings testified that in February 2004 C.C.H. turned three years old and in July 2004 had lived with the family for three years. She described how he loved to talk, was happy and full of life, and particularly close to M.H., his oldest brother. He fit seamlessly into the family, and it was in C.C.H.'s interest to stay with his siblings. The foster mother is a school counselor, and the father is a high school teacher. They had expressed a desire to adopt C.C.H.

Harris's employer testified that Harris was a direct caregiver and had provided in-home care to elderly and disabled patients for two-and-one-half years. She described Harris as an excellent and professional employee. She had only seen C.C.H. two times and was not aware that Harris's parental rights to her other three children had been terminated. Taylor Skaar, a domestic violence counselor at a woman's shelter, testified that the only requirement for women to receive services at the shelter is that they have a history of abuse. She testified that Harris had suffered domestic violence from her first husband and that "things" were "rocky" with her current husband, Cooks–Harris. She was not aware of any drug or alcohol use

by Harris. A neighbor also testified that he had never seen any evidence of drug use by Harris and was unaware of the protective order.

Harris then testified that her children had been in foster care for several years and that she was not allowed to know where they were because "I guess, my rights aren't as important as their's." She denied using drugs, taking her children to a crack house, or associating with a known sex offender. She complained that the "known" sex offender was convicted a year after her rights to her three older children were terminated. Harris admitted that she had used marijuana when she learned her daughter had been sexually abused by her boyfriend but that she had gone to the park to use it and had not used it around her children. She protested that she did not want to take drug tests because she did not want to pay for them. She acknowledged she had visited Gonzales in jail with her children once or twice because she wanted answers, he had them, and she could not find anyone to keep her children. She testified that CPS "endangered" her marriage to her current husband. She thought she had attended fifty or more Alcoholics Anonymous meetings over the past couple of years. She intended to divorce Cooks–Harris. She had stayed in San Marcos for the sake of her children, and she testified that "[t]hey'll be back." There was only a scant reference by Harris to the best interest of the child.

On cross-examination Harris testified that she had been removed from her mother's custody when she was a young teenager for reasons known to her mother. She stayed in a group home in Montana until she went home. She married Steve Dietrick and, like her mother, suspected that he molested her daughter, C.D. She did not report her suspicions to the police. She testified that Gonzales never lived with her but would stay with her several days each week as long as they dated, which was less than a month. She agreed it was not a wise choice to take the children to visit him in jail. She acknowledged that she had had a number of therapists, probably "less than ten." She also acknowledged that she had heard allegations from Ontiveros and others that a person with whom she was associating was a sex offender, but she was unable to confirm it to her satisfaction. Harris was twenty years old when she had her first child with Dietrick. They had two children together, he had a drug problem and abused her, and he was in prison. He did not provide any support for her or the children. She acknowledged that she refused to take a urinalysis test without a court order. She filed a grievance against the children's attorney ad litem for speaking to her out of the presence of her own attorney.

Based upon the evidence presented at trial and considering the pertinent factors from *Holley* and section 263.307 of the family code, I would conclude that, even when considered in the light most favorable to Harris, the evidence supports the trial court's presumed finding that appointment of the Department as managing conservator would be in the best interest of C.C.H. He had lived his entire life with the foster family who had adopted his siblings. The foster parents had raised C.C.H., and he was in good health and progressing normally. The record showed continuity of parental affection and care by the foster parents. There was ample testimony that C.C.H. had bonded with his foster family, was close and attached to his siblings, and that the family was a strong family unit. Both the guardian ad litem and the attorney ad litem recommended that Harris's parental rights to C.C.H. be terminated and that the best interest of the child would be served by allowing him to remain with the only family he has

known. At the time of the trial, both biological parents had violated a domestic-violence protective order, the biological father whose rights to C.C.H. had been previously terminated was in jail for violation of the protective order, and there was an indication that the conduct would continue. Even if the factfinder had believed Harris that she obtained the protective order out of anger, the record showed that Harris was complicit in ignoring two court orders—the protective order and the court's order that Cooks–Harris undergo a paternity test. There was no evidence of any emotional attachment between the child and his remaining parent.

Case workers testified that the Department's permanence plan for C.C.H. was termination and placement for adoption because Harris had demonstrated noncompliance with previous services and C.C.H. had been placed with the foster parents who adopted his brothers and sister. Harris demonstrated recalcitrance in accepting the Department's services and made desultory and meager efforts to act in the interest of her children.

The presumption in favor of a biological parent flows from the belief that the parent will act in the child's best interest, a presumption that has been rebutted and for which I would conclude there is no evidence here. Query how it cannot be in a child's best interest to stay with the only stable, loving family unit—including his brothers and sister—that he has known in his entire life. It is evident from the record that the length of time C.C.H. has been living with his foster family is a significant factor. Courts have recognized a child's need for permanence as "the paramount consideration for the child's present and future physical and emotional needs." *In re M.A.N.M.*, 75 S.W.3d 73, 77 (Tex.App.-San Antonio 2002, no pet.); *see Lehman v. Lycoming County Children's Servs. Agency*, 458 U.S. 502, 513, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982) (children need stable, long-term relationships with caretakers). But my view does not rest on lapse of time or assigning blame for the delay in these proceedings. We may not allow a determination of the best interest of the child to turn on personal preferences, speculative concepts of proper child rearing, or who "deserves" the child; it is for this reason that we rely on the determinable legal standard provided by the *Holley* and statutory factors, none of which support a finding in favor of the mother based on the record before us.

Our task is made difficult by the Department's perfunctory performance in adducing evidence regarding C.C.H.'s best interest. And Harris's attorney advised the jury in his opening statement that the trial would be contentious and "we're going to have a dog fight." In his closing statement he reiterated that he "promised you that you'd see a dog fight. You saw a dog fight. It's ugly. There ain't a pretty thing about a dog fight.... Both dogs usually get hurt." It does not redound to the child's benefit or that of the system for a trial to deteriorate into pitched battle. And we should not protect parental rights at the expense of the best interest of the child, for the best-interest analysis evaluates that of the child, not that of the parent.

Even when all of the evidence is viewed in the light most favorable to the verdict and considered under the pertinent *Holley* and section 263.307 factors, I would conclude that the evidence presented at trial would not enable reasonable and fair-minded people to reach the verdict reached by the jury. I would conclude that the evidence is legally insufficient to support the jury verdict and sufficient to support the trial court's presumed finding that appointment of the Department as managing conservator would be in the best interest of C.C.H. *See Lenz*, 79 S.W.3d at 19.

Because I would affirm the judgment of the trial court, I respectfully dissent.