# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00122-CV

**T. L. M., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 425TH JUDICIAL DISTRICT
NO. 09-2488-F425, HONORABLE MARK J. SILVERSTONE, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

A jury found by clear and convincing evidence that T.L.M. ("T") engaged in at least one act or omission that is grounds for termination of her parental rights and that termination is in the children's best interests. On appeal, she contends that an appellate court conducting a sufficiency review in a termination case should use a de novo standard instead of the factual and legal sufficiency standards prescribed by the Texas Supreme Court. She also asserts that the evidence is legally and factually insufficient to support the jury's findings and that the trial court erred by admitting hearsay evidence. We will affirm the judgment.

**Standard of review for sufficiency challenges in parental-rights termination cases**

A trial court can involuntarily terminate a parent-child relationship only if the court finds by clear and convincing evidence (1) that the parent has committed an act or omission statutorily deemed to warrant termination and (2) that termination of the relationship is in the

child's best interest. Tex. Civ. Prac. & Rem. Code Ann. § 161.001 (West Supp. 2011). If the legal sufficiency of the evidence supporting termination is challenged, we consider all of the evidence in the light most favorable to the termination finding and determine whether a reasonable trier of fact could have formed a firm conviction or belief that the finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). If the factual sufficiency of the evidence supporting termination is challenged, a court of appeals must uphold the decree if a reasonable fact-finder could form a firm conviction or belief from the evidence presented that grounds exist for termination and that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

T urges that we depart from these established standards and instead make a de novo determination of the sufficiency of the evidence supporting the jury's termination of her parental rights, giving little deference to the jury as finder of fact. We decline T's invitation to hold that the standards of review pronounced by the Texas Supreme Court fail to satisfy federal due process guarantees, and we instead defer to the supreme court's requirement that we balance the competing and complementary rights and interests at issue in these cases. *See id.* The supreme court has written that, while the parent-child relationship is of constitutional magnitude, the parent's rights are not absolute, and the child's emotional and physical interests must not be sacrificed merely to preserve the parent's constitutional right to the relationship. *Id.* at 26. By infusing the clear-and-convincing burden of proof into the generally applicable civil sufficiency standards of review, the supreme court set a heightened standard for appellate courts reviewing termination of this important relationship, while retaining due deference to the jury's fact-finding function and respecting the legislature's choice to not require proof beyond a reasonable doubt. *Id.* at 26-27. Although the Texas Supreme Court may one day directly address whether certain fact scenarios call for appellate

2

courts to conduct a de novo review of the findings supporting termination of a parent-child relationship, *see id.* at 29 (Hecht, J., concurring), we are not, as an intermediate court of appeals, persuaded to reject the well-established standards of review on the facts of this case.

**Sufficiency of the evidence supporting the jury's termination decision**

Under the charge presented at trial, the jury found by clear and convincing evidence at least one of three statutory grounds warranting termination and that termination of T's parental rights was in her children's best interests. *See* Tex. Fam. Code Ann. § 161.001. In addition to reviewing the implied best-interest finding, we will examine whether sufficient evidence supported the jury's implicit finding that T "engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional wellbeing of the children . . . ."[1] *See id.* § 161.001(1)(E).

To "endanger" means to expose the child to loss, injury, or danger. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). Although "'endanger' means more than a threat of metaphysical

---

[1] If we find one ground supported by sufficient evidence, we need not examine the others. *See Richardson v. Green*, 677 S.W.2d 497, 499 (Tex. 1984) (termination decree can stand on one of the statutory grounds plus best-interest finding); *see also* Tex. R. App. P. 47.1 (opinion shall be as brief as practicable while addressing issues raised and necessary to the disposition).

The trial court also instructed the jury that it could consider whether T "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional wellbeing of the children." *See* Tex. Fam. Code Ann. § 161.001(1)(D) (West Supp. 2011). The trial court also instructed the jury that it could consider whether "[T] failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the children who have been in permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children." *See id.* § 161.001(1)(O).

injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id*. The conduct does not have to occur in the presence of the child; it may include conduct before the child's birth and both before and after the child has been removed by the Department. *Clark v. Clark*, 705 S.W.2d 218, 219 (Tex. App.—Dallas 1995, writ dism'd). "Conduct" includes not only acts but omissions. *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied); *In re P.S.*, 766 S.W.2d 833, 835 (Tex. App.—Houston [1st Dist.] 1989, no writ).

Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). A parent's voluntary, deliberate, and conscious course of criminal conduct, undertaken while knowing his parental rights are in jeopardy, can endanger the child's emotional well-being. *Robinson v. Texas Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 686-87 (Tex. App.—Houston [1st Dist.] 2002, no pet.). "[I]ntentional criminal activity which expos[es] the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well being of the child." *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.).

T had three children who are the subject of this case: a boy born in April 2002, a girl born in June 2006, and a girl born in April 2008. All three children were born in Ohio and lived there until moving to Texas in May 2009. T testified at trial, describing a somewhat chaotic life of financial manipulation and emotional abuse inflicted by the father of the younger children in Ohio. She twice put the children in temporary foster care while living in Ohio—once to avoid leaving them with untrusted family and once at a court's request after T hit the oldest child. An Ohio Children's

4

Services caseworker testified that T's actions caused marks and bruises on the boy's arm and his eye. The children's Texas foster mother testified that the boy feared that T might whip him and "get blood on his behind again." Because the caseworker and the foster mother described injuries to discrete areas of the boy's body, their descriptions may refer to different incidents.

The jury heard testimony from multiple witnesses that the children's lives remained unstable after they moved to Texas, progressing from a family member's house to various shelters and, briefly, to their own apartment before being removed to foster care. T said they first moved from Ohio to her cousin's home in Texas in early May 2009, but left after a few days because it was overcrowded and dominated by the cousin's verbally abusive boyfriend. They moved to SafePlace, a shelter for persons affected by sexual abuse and domestic violence. According to a witness who was at SafePlace, T occasionally locked the children into her apartment without a babysitter while she went out—sometimes past curfew. That witness testified that the children banged on the door from the inside while T was gone and that T returned drunk and smelling of marijuana at least once. The witness also testified that T reported having "johns" who gave her money. T and her children were evicted after two months at SafePlace when T confronted a fellow resident and accused her of stealing T's purse and its contents. The family moved to a similar shelter in Bastrop. T said that, after a few days, she felt the shelter employees were enforcing their rules too strictly and, when her son broke one of the rules, she "jokingly" said to her son "get over here; I'm going to bash your head in." Shelter employees reported that incident to the Department, and T and her family were "exited" from the shelter by the end of July. T then left the children at a third shelter for three weeks while she secured a place to live. While the children were in that shelter, there was a report to the

5

Department of sexual abuse between the children; however, the Department did not find reason to believe abuse had occurred.

T called the shelter to deliver the children when she moved into an apartment on August 20, 2009, but she did not have any furniture or food in the apartment when the children arrived, prompting a referral to the Department. When the Department's investigator arrived the next morning, the children did not appear to be bathed, groomed, or dressed for the day. The investigator did not find food although T testified food was present. The investigator left to see about obtaining food for the family and sources for other items T wanted. Witnesses testified that, about an hour later, T began leaving a series of demanding rants on voicemail for the investigator and her supervisor, accusing them of getting their nails done instead of helping her. Department employees testified that, in addition to criticizing them, T refused to let them help her by taking her to apply for food stamps. Department witnesses testified that the tone and content of T's interactions with the Department created concern for her mental health and the children's safety. Those concerns prompted the removal of the children.

The Department placed the children in foster care, set up a Family Service Plan, and established family reunification as its goal. Under the Plan, T had to pay child support, provide written proof that she had gotten a job, maintain a clean house, submit to a psychological evaluation, take an anger-management class, participate in protective parenting classes, engage in individual therapy, and submit to drug testing. She participated in services with some success, although her first caseworker testified that T was completing assigned tasks but not making progress toward the goals set in the Plan. Over the course of several months, T's visits with the children lengthened from supervised one-hour visits to unsupervised overnight visits. Her caseworker testified that T was

6

overwhelmed when the visits stretched to two overnights. The Department scaled back the visits and hired a family therapist with the goal of again increasing the visit time.

After her children were removed in August 2009, T said she needed money and sought to "manipulate some old guy" for financial assistance. She found Robert Chiles on a website called "sugardaddyforme.com." T and Chiles testified that T provided Chiles company and occasionally sex and, in return, received about $200 per week, clothes, supplies, photos, and a $7,000 car. The two got engaged in July 2010. Chiles testified, however, that T told him that she was "tricking"—engaging in prostitution—with other men while they were together. On September 25, 2010, Chiles and T had an argument that escalated to mutual demands for the return of belongings and eventually to a physical confrontation. Chiles and T each testified that the other was the aggressor, but it is undisputed that the confrontation progressed to swinging things at one another. It is undisputed that, after Chiles pushed T backwards, T went to the kitchen and returned swinging a knife. Chiles held up his hands, and T slashed one of his hands deeply enough to cause blood to spurt as well as lasting nerve and muscle damage. T was arrested and jailed. Uncertainty regarding the length and nature of any punishment or incarceration, plus revived concerns about T's stability and the children's safety, caused the Department to cancel T's visitation and request termination of T's parental rights.

The evidence presented at trial about T and the children was not unrelentingly negative. Despite the many challenging circumstances that T was not necessarily well-equipped to handle, the children are apparently healthy and bright, notwithstanding some deficits and difficulties that are being addressed in foster care. T obtained housing, and furnished and maintained it even after the children were removed. She participated in and completed many of the services required

7

by the Plan, albeit without necessarily acquiring the desired skills. By all accounts, T and the children love each other and miss each other.

On appeal, however, we are not to substitute our judgment based on our review of the written record in place of the findings of a jury that heard live testimony and found by clear and convincing evidence that T's parental rights should be terminated. On the whole, the record contains legally and factually sufficient evidence for the jury to have formed a firm belief or conviction that T's acts or omissions exposed the children to loss, injury, or danger. There was conflicting evidence and evidence casting doubt on the credibility of some witnesses, and—within reasonable limits not exceeded here—we must defer to the jury's determinations of the credibility of the witnesses, the weight to be given the testimony, and the resolution of evidentiary conflicts. *Harris v. Texas Dept. of Family & Protective Servs.*, 228 S.W.3d 819, 823 (Tex. App.—Austin 2007, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 821-22 (Tex. 2005)). The jury could reasonably believe that T kept the children in danger in Ohio by repeatedly allowing contact with the abusive father of the younger girls and, when she broke away, putting them into a similar environment in Texas. We note this history not to blame T for her circumstances, but to show why the jury had sufficient evidence to form a firm belief or conviction that T's acts and omissions exposed the children to a dangerous environment.

The evidence of the Ohio incidents is not the only evidence from which the jury could have found a basis for termination. There was evidence that T repeatedly found herself overwhelmed and demanded that someone else take care of her children. She and her children were further destabilized by their eviction from two shelters designed to help people in similar crisis situations. There was also evidence that she engaged in activities described as prostitution, despite

8

knowing that illegal activity, if discovered, could jeopardize her chance of regaining possession of her children. She showed a tendency to react with violence that she later regretted, hitting her oldest child in such a way that she felt compelled to seek emergency care and—possibly on a separate occasion—drawing blood while spanking his buttocks. She also culminated an argument with her fiancé by cutting his hand with a knife despite knowing that her behavior was being scrutinized to assess her fitness for the return of her children. While many of these actions taken in isolation might not warrant termination of T's parental rights, we conclude that, taken collectively, they comprise a record containing legally and factually sufficient evidence on which reasonable jurors could find by clear and convincing evidence that T's acts and omissions endangered the children's emotional and physical well-being.

We must also examine whether legally and factually sufficient evidence supports the jury's finding that termination of T's parental rights is in the children's best interests. *See* Tex. Fam. Code Ann. § 161.001(2). There is a strong presumption that a child's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). However, even though a parent's right to a relationship with a child has constitutional underpinnings, courts will not sacrifice the child's emotional and physical interests to preserve that right. *See C.H.*, 89 S.W.3d at 27. Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. *See In re M.C.T.*, 250 S.W.3d 161, 170 (Tex. App.—Fort Worth 2008, no pet.) (citing Tex. Fam. Code Ann. § 263.307(a) (West 2008)). Much of the evidence that concerned the grounds for termination in this case applies to the determination of the children's best interests. We see no basis in the record that the individual children had divergent interests, so we will consider their interests collectively.

In *Holley v. Adams*, the Texas Supreme Court provided a nonexclusive list of nine factors that the trier of fact may use in a termination case to determine the best interest of the child. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive, and there is no requirement that the petitioner prove all factors as a condition precedent to parental termination. *C.H.*, 89 S.W.3d at 27. Evidence of one factor may suffice as support of a finding that termination is in the child's best interest. *See id*. However, termination of the parent-child relationship is not justified when the evidence shows merely that a parent's failure to provide a more desirable degree of care and support of the child is due solely to misfortune or the lack of intelligence or training, and not to indifference or malice. *Clark v. Dearen*, 715 S.W.2d 364, 367 (Tex. App.—Houston [1st Dist.] 1986, no writ).

The jury could have applied the *Holley* factors to the evidence presented at trial as follows:

1. The children's desires. The children did not testify, but the foster mother said that the children want to at least visit with T, despite the boy's concern that T will injure him while spanking him.

2./3. The emotional and physical needs of the child now and in the future/The emotional and physical danger to the child now and in the future. The oldest child is described as very intelligent and active. The middle child had educational deficits that she has overcome while in foster care. The youngest child is also reportedly bright and active. The Department reported that the older children have some emotional processing and control issues.

These children collectively present a challenge that the jury reasonably could have found overwhelmed T. After taking some classes and therapy, T completed some two-night unsupervised visits but cut one short, sparking concern about longer custody. The family therapist testified that T is capable of learning to parent effectively, but would require support. Evidence in the record casts doubt on whether she has such support. Although a member of her church testified that she and others would help, the church member elected not to post bail for T. T has shown a pattern

of reacting strongly and in ways that affected the stability of the children's living arrangements and her freedom. T injured one of her children severely enough to prompt her to seek emergency medical treatment and to cause the child to express continued worry about recurrence. The jury could find that the combination of the children's needs and T's challenges in meeting them present an emotional and physical danger to the children now and in the future.

4. Parental abilities of the persons seeking custody. The record does not clearly indicate anyone seeking custody of the children other than T, although the caseworker was hoping to place the children with the boy's paternal grandfather. There is evidence that T has the ability to learn parenting skills and she testified that she had learned many things through the course of this case, but there is also evidence that T has repeatedly failed to avail herself of resources offered to help her, and that she can lash out when frustrated, injuring others, or shut down when overwhelmed and seek someone else to care for her children.

5. Programs available to assist these individuals to promote the best interest of the child. T reportedly had exhausted the resources available to her without achieving sufficient parental capabilities. There was evidence that T sometimes participated in programs begrudgingly and did not fully use available resources, often demanding that the State or others provide services and materials that Texas does not customarily provide. There was also evidence that T continued to demand those services and materials despite being told that they would not be forthcoming or that she would need to take necessary steps to qualify for assistance.

6/7. The plans for the child by these individuals or by the agency seeking custody/ The stability of the home or proposed placement. Witnesses testified that the Department seeks adoption of the children together and speculated that such should be possible. The Department did not provide any certain prospects for T's children, however. Although T had maintained an apartment since the children were removed, she did not consistently demonstrate an ability to provide a stable home with the children in it even when their visits were limited to two days.

8. The acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one. The evidence of T injuring the boy when administering punishment could weigh into this factor, as could the boy's reported behavioral issues, struggle with rules, and worry about being injured further by his mother. The lack of communication between T and the boy during the later visits also is troubling, as were the former educational deficits of the middle child. The jury could have also been concerned by T's history of leaving the children alone in their apartment and, on occasions when she had a babysitter, staying out well past the agreed return time.

11

9. <u>Any excuse for the acts or omissions of the parent.</u> There is ample evidence that T had her own bad experiences with childhood, parenting, and the foster system. She has emotional, intellectual, and financial challenges. The father of T's younger children was allegedly abusive. She hoped to improve her situation by moving to Texas, but met new challenges. The jury reasonably could have concluded that these facts do not excuse T's seeming unwillingness or inability to utilize the resources available to her and provide for the children. The jury could also have had concerns about T's violent outbursts, particularly those that occurred when she had to know the potentially dire consequences of the latter for her desire to regain custody of her children.

The evidence is sufficient to support a conclusion that, while T appears to love her children, she gets overwhelmed when faced with the rigors of supervising three young, bright, energetic children. When she gets frustrated she has a history of lashing out physically or verbally at both the children and those trying to help her and the children. While she may have taken some parenting and anger-management courses, she did not consistently demonstrate an interest in or ability to implement the skills taught. Viewed through the *Holley* template, the evidence in this case is legally and factually sufficient to support the jury's finding by clear and convincing evidence that termination of T's parental rights is in the children's best interests.

**Admission of hearsay evidence**

The evidence admitted at trial included an unredacted copy of the Family Service Plan. T asserts that the trial court erred by admitting hearsay evidence through the unredacted Plan, permitting the jury to infer that she had committed uncharged acts of neglect. *See* Tex. R. Evid. 801(d), 802-04. T complains about the admission of unattributed statements alleging neglect or abuse that were contained in the Family Service Plan's introductory section entitled "Reason for Child Protective Services involvement." These include statements regarding (1) a July 24, 2009

12

report that T threatened the boy at the Bastrop shelter, (2) August 6, 2009 reports alleging neglectful supervision of the children and sexual acting-out by the children, and (3) the August 21, 2009 referral alleging physical neglect based on the lack of food, furniture, and basic necessities in the new apartment and the fact that the children had not eaten in a day. T alleges that these unattributed statements found within the Family Service Plan do not fall within the business-records or public-records exception to the hearsay exclusion rule, relying on *In re E.A.K.*, 192 S.W.3d 133, 142-45 n.17 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

We review the admission of evidence for an abuse of discretion. *E.I. du Pont Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). We may reverse the judgment on appeal for the erroneous admission of evidence only if we conclude that the error probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1. The erroneous admission is harmless if the evidence is merely cumulative of evidence admitted elsewhere at trial. *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004).

Even if the trial court erred by admitting the Plan without redaction, the three statements about which T complains were cumulative of evidence admitted elsewhere in the case. Bastrop CPS investigator Michelle Salazar testified at trial about both the July 24, 2009 reports of T's alleged physical abuse and threat to the boy and the August 6, 2009 reports alleging neglectful supervision of the children and sexual acting-out by the children. Williamson County CPS investigator Katie Reyes testified about the allegations of neglect in the August 21, 2009 report.

13

The admission of the investigators' testimony cured any error which may have arisen from the admission of hearsay statements in the unredacted Plan.

## CONCLUSION

We conclude that the proper standard of review for evidentiary sufficiency is not de novo review but the customary standard modified by the clear-and-convincing burden of proof at trial. Using that established standard, we conclude that the record contains legally and factually sufficient evidence to support the jury's finding that clear and convincing evidence shows that T committed acts or omissions that endangered the children's physical and emotional well-being, and that termination of T's parental rights is in the children's best interests. We further conclude that the trial court's admission of the unredacted Family Service Plan was harmless because it was cumulative of other evidence admitted at trial. We affirm the judgment.

_____

Jeff Rose, Justice

Before Justices Puryear, Rose and Goodwin

Affirmed

Filed: April 19, 2012