**Affirmed and Memorandum Opinion filed January 10, 2023.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-21-00574-CV

---

## IN RE D.W., JR., Z.W., AND W.W., CHILDREN

---

**On Appeal from the 300th District Court
Brazoria County, Texas
Trial Court Cause No. 96662-F**

---

## M E M O R A N D U M   O P I N I O N

This appeal arises from a final judgment modifying the parent-child relationship following a jury trial. Appellant M.N. ("Mother") challenges the part of the judgment awarding appellee D.W. ("Father") the exclusive right to designate their children's residence. In two issues, Mother argues that (1) the evidence is legally and factually insufficient to support the jury's finding of a material and substantial change in circumstances that justified modifying the prior child custody order, and (2) the trial court erred in overruling Mother's motion for new trial. We affirm.

## Background

Because we engage in an evidentiary sufficiency analysis below, we initially summarize only some key facts and the procedural history of the case.

Mother and Father divorced in 2018. In an Agreed Final Decree of Divorce, rendered September 25, 2018, Mother and Father were appointed joint managing conservators of their three children, D.W., Jr. ("David"), Z.W. ("Zora"), and W.W. ("Wilma"), then aged seven, five, and two years old, respectively. Under the 2018 decree, Mother had the exclusive right to designate the children's primary residence within Brazoria County, Texas. After the divorce, Mother began dating G.N. ("Greg"), whom she later married in November 2019.

Both Father and Mother were practicing medical doctors with extremely busy schedules. Because of this, Mother hired three nannies to care for the children while she was not at home. In February 2020, one of the nannies called Father and reported that Greg was abusing the children. The Department of Family and Protective Services (referred to by the parties as "CPS") conducted an investigation of the nanny's allegations and "ruled out" all allegations of neglectful supervision, physical abuse, and sexual abuse of the children by Mother or Greg.

Father filed an original petition to modify the parent-child relationship, seeking the exclusive right to designate the children's primary residence and a change in the geographical restriction of the children's residence. Mother filed a counter-petition, seeking modification of Father's summer visitation rights and an increase in child support.

The trial court entered temporary orders, granting Father possession of the children and allowing Mother temporary visitation. The court enjoined Mother from allowing the children to be in Greg's presence or to have contact of any kind

with Greg. The court appointed Dr. Edward G. Silverman to perform a child custody evaluation.

After a four-day trial, a jury found that the prior order designating Mother as the conservator with the exclusive right to designate the children's primary residence should be modified and that Father should have the exclusive right to designate the children's primary residence within the continental United States. The trial court signed a judgment incorporating the jury's findings. Mother filed a motion for new trial, challenging the legal and factual sufficiency of the evidence, which was overruled by operation of law.

Mother appeals.

## Analysis

Mother presents two related issues for review. First, Mother challenges the legal and factual sufficiency of the evidence supporting the jury's finding that the circumstances of the children or parents materially and substantially changed since September 25, 2018, when the prior custody order was rendered. Second, Mother argues that the trial court abused its discretion in denying her motion for new trial, in which she raised the same legal and factual insufficiency points.

### A. Standards of Review

We review Mother's challenge to the sufficiency of the evidence—whether asserted in her motion for new trial or as a ground for reversal on appeal—under the same standard. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822-23 (Tex. 2005) (setting out standard for reviewing sufficiency challenges and holding that "the test for legal sufficiency should be the same for summary judgment, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review").

3

In this case, the jury determined the conservatorship issue. *See* Tex. Fam. Code § 105.002(a), (c)(1)(D) (authorizing party to demand jury trial and stating that court may not contravene jury verdict on specified issues, including the determination of which joint managing conservator has the exclusive right to designate the primary residence of the child).

We will sustain a legal sufficiency or "no-evidence" challenge to the jury's findings if the record shows one of the following: (1) a complete absence of evidence of a vital fact; (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *See City of Keller*, 168 S.W.3d at 810; *see also Lenz v. Lenz*, 79 S.W.3d 10, 17 (Tex. 2002) (jury's verdict in modification proceeding is subject to ordinary legal sufficiency review). In a legal sufficiency review, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller*, 168 S.W.3d at 822, 827. We must also indulge every reasonable inference in favor of the finding. *See In re J.R.L.*, No. 04-19-00049-CV, 2020 WL 2543315, at *2 (Tex. App.—San Antonio May 20, 2020, no pet.) (mem. op.).

"When reviewing a jury verdict to determine the factual sufficiency of the evidence, the court of appeals must consider and weigh all the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Under either standard of review, we will not substitute our judgment for the jury's, and we must defer to the jury's reasonable determinations of the credibility

4

of the witnesses, the weight to be given to their testimony, and the resolution of evidentiary conflicts. *See Harris v. Tex. Dep't of Family & Protective Servs.*, 228 S.W.3d 819, 822-23 (Tex. App.—Austin 2007, no pet.).

Mother timely raised her evidentiary arguments in a motion for new trial. The court did not determine that motion by written order within seventy-five days from the date of judgment, and the motion was overruled by operation of law. Tex. R. Civ. P. 329b(c). We review the denial of a motion for new trial for abuse of discretion. *In re Marriage of Sandoval*, 619 S.W.3d 716, 721 (Tex. 2021) (per curiam) (citing *Strackbein v. Prewitt*, 671 S.W.2d 37, 38 (Tex. 1984)). A trial court does not abuse its discretion in denying a motion for new trial challenging evidentiary sufficiency to support a finding if the evidence, viewed under the appropriate standard, is sufficient. *See PNS Stores, Inc. v. Munguia*, 484 S.W.3d 503, 510 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *Alahmad v. Abukhdair*, No. 02-12-00084-CV, 2014 WL 2538740, at *10 (Tex. App.—Fort Worth June 5, 2014, pet. denied) (mem. op.).

**B.    Law Governing Modification**

Family Code section 156.101, "Grounds for Modification of Order Establishing Conservatorship or Possession and Access," provides in pertinent part:

> (a) The court may modify an order that provides for the appointment of a conservator of a child, that provides the terms and conditions of conservatorship, or that provides for the possession of or access to a child if modification would be in the best interest of the child and:
>
> > (1) the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the earlier of:
> >
> > > (A) the date of the rendition of the order . . . .

5

Tex. Fam. Code § 156.101(a)(1)(A).

Thus, the existence of a material and substantial change in circumstances is a threshold determination. *In re A.L.E.*, 279 S.W.3d 424, 428 (Tex. App.—Houston [14th Dist.] 2009, no pet.). In making this determination, the trial court "is not confined to rigid or definite guidelines"; rather, the determination is fact specific and must be made according to the circumstances as they arise. *Id.* Material changes may include the marriage of one of the parties, changes in the home surroundings, mistreatment of the child by a party, or a party's becoming an improper person to exercise custody. *See id.* at 428-29. The person seeking the modification has the burden of establishing a material and substantial change by either direct or circumstantial evidence. *Id.* To show that a material and substantial change in circumstances has occurred, the movant must show conditions as they existed at the time the prior order was signed. *Id.* at 429. The movant also must show what material and substantial changes have occurred in the intervening period. *Id.* at 428. Without both historical and current evidence of relevant circumstances, the fact finder has nothing to compare and cannot determine whether a change of circumstances has occurred. *See Zeifman v. Michels*, 212 S.W.3d 582, 589 (Tex. App.—Austin 2006, pet. denied).

## C. Application

Mother's sole argument is that Father failed to present any evidence of the circumstances as they existed on September 25, 2018:

> Father provided the jury and the trial court with much evidence regarding acts and omissions that occurred after September 25, 2018. While that evidence was hotly disputed, what it was not was evidence of the situation of Mother, Father or the children, prior to September 25, 2018, which was the date that judgment was rendered on the Agreed Final Decree of Divorce.

6

She faults Father's trial counsel for not explicitly asking, and obtaining an answer to, questions such as "Has there been a material and substantial change in the circumstances of [the children] after judgment was rendered on the Agreed Final Decree of Divorce on September 25, 2018?" and "In what ways, have [the children's] circumstances materially and substantially changed after September 25, 2018?" However, "the law does not prescribe any particular method for a showing of changed circumstances, which may be established by circumstantial evidence." *In re A.L.E.*, 279 S.W.3d at 429 (citing *Wright v. Wright*, 610 S.W.2d 553, 554-55 (Tex. App.—Houston [1st Dist.] 1980, no writ); *T.A.B. v. W.L.B.*, 598 S.W.2d 936, 939 (Tex. App.—El Paso), writ ref'd n.r.e.); *Brown v. Brown*, 500 S.W.2d 210, 216 (Tex. App.—Texarkana 1973, no writ)).

Considering both the direct and circumstantial evidence, the jury reasonably could have found that the circumstances of the child, a conservator, or other party affected by the September 25, 2018 judgment materially and substantially changed since the judgment. We summarize the pertinent testimony and evidence, in the light most favorable to the jury's verdict.

According to Father, the "kids seemed like they were okay after the divorce." Mother and Father's co-parenting relationship "was initially very good. She was flexible." Father was communicating directly with Mother. The children lived with Mother, and Father picked them up from Mother's house for visits once or twice a month. Father also went to the children's schools "a few times during the week" to have lunch with them.

Then Mother began dating Greg in late 2018. Once Greg came into the picture, the main impediment to co-parenting was communication. Greg bombarded Father with hundreds of text messages and voicemails, filled with demeaning and derogatory insults. Greg told Father in an April 2019 voicemail,

7

"We can have a good co-parenting relationship and we shall, but you have to understand I'm in control. I am in control. I am the king. I am the God. And that's that." Greg's behavior undermined Father's ability to co-parent with Mother, with whom Father was totally unable to communicate because Greg insisted that "all communication had to go through [him]." Mother asked Father more than once to relinquish his parental rights, which he refused to do. Mother and Greg began "living together" in June 2019, although Mother testified that the children did not "give up the house that they were familiar with" and instead "stay[ed] in both houses." Mother and Greg married in November 2019.

Elda Chavira, one of the children's three nannies, called Father in February 2020 to report that the children "were being abused" by Greg. Father tried calling Mother, who did not answer. Father took the children to Texas Children's Hospital for evaluation and examination. None of the children made an outcry of sexual assault. However, all three children stated that their stepfather, Greg, hit them. David said that Greg hit and slapped him and tried to choke his sisters. All three children stated that they did not feel safe with Greg. Father testified that the children's other nannies also told Father that the children may have been abused or neglected while in Mother's custody.

Father took possession of the children in February 2020, and they remained in his custody until trial. Mother was allowed supervised visitation, but Greg was prohibited from contacting the children. Father testified that the children were very stressed following the events in February 2020 but, with time and counseling, their behavior had improved dramatically by the time of trial.

According to Father, he felt that it was necessary to seek custody of the children because they were not safe. The biggest change for the children since the divorce was "they're kind of in an unstable environment, and that's what we're

8

trying to sort out here is, you know, what's best for them and what's stable for them."

Dr. Silverman testified about the child custody evaluation, and his 101-page report was admitted into evidence. Among other things, Dr. Silverman reviewed records and interviewed Mother, Father, and the children. Although asked to participate in Dr. Silverman's evaluation, Greg refused.

Dr. Silverman understood from Mother that she allowed Greg to be the "primary disciplinarian" in the children's lives. Dr. Silverman "definitely thought it was a mistake" to allow that. David told Dr. Silverman that "[Greg] always hits [David] and his sisters every time when [Mother] leaves or when [Mother] is sleeping, and [Mother] would do nothing." Zora related instances when Greg "chok[ed]" her and "grabbed" her leg, which Zora gave as examples of Greg being "mean." Wilma told Dr. Silverman that Greg spanked her "for no reason because she cries" and that Greg choked her sister. She also said, "Mommy said it wasn't true when we said [Greg] hit us and choked us, but it is true."

Regarding the fact that CPS ruled out the allegations of abuse by Mother and Greg, Dr. Silverman stated that "it doesn't necessarily mean that nothing happened. It certainly doesn't mean definitively that the allegations are fabricated or coached. It strictly means that CPS did not feel that the statutory requirements for abuse or neglect were met. [J]ust because CPS ruled out the allegations doesn't mean that the things that were reported by the nannies did not occur."

Ultimately, Dr. Silverman was not able to conclude "with a reasonable degree of certainty whether or not the observations of maltreatment that were reported by Elda Chavira, and to a much lesser extent the other nannies, actually occurred." Complicating his assessment was Greg's refusal to participate in the evaluation. Dr. Silverman opined that "[i]t is certainly possible that the children

9

have been exposed to excessively harsh and inappropriate physical discipline that falls short of physical abuse but would still be characterized as child maltreatment that would be detrimental to the children's emotional welfare."

Dr. Silverman testified that he would have concerns about returning the children to Mother's custody because of the children's "frame of mind about what [Greg] has done." Dr. Silverman said that Mother's "willingness to allow her husband to take a primary disciplinary role with the children, and her unwillingness to consider the possibility that there may be some truth to Ms. Chavira's reports, would be considered parental liabilities."

The three nannies had all left Mother's employment by the time of the trial. Chavira testified that she left Mother's employment because Greg was "beating up the kids really bad . . . and I was afraid he was going to hurt them really, really bad." According to Chavira, Mother said that Greg "wasn't like this before [they] got married. He's showing his true colors after [they] got married." Chavira was very concerned when Mother said that Greg was going to take care of the children when Mother was at work:

> I told her, [Mother], after everything I told you that he was doing to the babies, are you planning on him taking care of the kids and spend the nights with them when you have a night shift? And her answer was, well, yes, he's always here. He doesn't work. I'm the breadwinner. He can do it.

Adriana Hemphill also worked as a nanny for the children. Hemphill worked primarily at Mother's house and a few times at Greg's house. Hemphill testified that she smelled marijuana smoke at Greg's home when she worked there. She witnessed Greg act unusual, weird, and "high." Hemphill testified that she stopped working for Mother in December 2019 because she "was feeling uncomfortable when [Mother] married [Greg]. Things changed." The children

10

"started changing. They became more aggressive, hard to deal with. . . . They would throw temper tantrums. They would set off very easy." This was consistent with Chavira's observations, because she said David first started showing aggressive behavior while living at Greg's house, after December 2019. Hemphill recalled a time when Greg punished David, who hid "under the bed." Hemphill called Mother about Greg's punishment, and Mother said "it was okay, that he was punished and he needed to be punished." Hemphill testified that Mother was "a good provider for the children," meaning monetarily, but that Hemphill did not really see Mother with the kids because Mother was always working.

The third nanny, Betsy Nadurilli, left Mother's employment in 2019 because she "no longer felt at ease with the situation." She testified that, one night, Greg came into the children's bedroom and stared at them in bed but quickly left once he realized Nadurilli was present. After Nadurilli complained to Mother, Mother asked Nadurilli if she thought Greg was a pedophile, and Nadurilli said not to put words in her mouth. She just wanted to make sure it was safe to leave the children with Greg while Mother was not at home. After that instance occurred, Mother told Nadurilli that she was going to allow Greg to "start doing the daycare for the children or the caring for the children on weekends," a decision with which Nadurilli was uncomfortable. Nadurilli echoed Hemphill's claim that Greg's home smelled of marijuana smoke.

Based on this evidence, we cannot say that there is no evidence of a material and substantial change in circumstances from those that existed on September 25, 2018. The most obvious and substantial change is that Mother began dating Greg after her divorce and that Mother and the children lived in two locations, including Greg's house. There was substantial evidence that Greg, once he entered the children's lives, was physically abusive to the children. There was no evidence

11

that Father or Mother were abusive to the children before Greg entered their lives. Chavira and Hemphill both testified that the children's behavior changed and worsened after Mother and Greg married and began living together, in 2019. Father also testified that Greg's introduction to Mother's and the children's lives presented an untenable challenge to Father's ability to communicate and co-parent with Mother. These conditions did not exist as of September 25, 2018; indeed, they could not have existed because the evidence established that Mother and Greg did not begin dating until "the end" of 2018,[1] started living together in June 2019, and married in November 2019. Thus, there is legally sufficient evidence to support the jury's finding that the children's circumstances, as well as the circumstances regarding Mother's and Father's ability to co-parent, and the living arrangements of Mother and the children, had materially and substantially changed since the rendition of the 2018 divorce decree and custody order. *See, e.g.*, *In re A.L.E.*, 279 S.W.3d at 429-30 (evidence that child's home environment changed and mother's substance-abuse problems rendered her unfit to exercise primary custody was sufficient to support finding of changed circumstances); *see also In re S.S.*, No. 05-21-00109-CV, 2022 WL 1577217, at *3 (Tex. App.—Dallas May 19, 2022, no pet.) (mem. op.) ("Among the things a trial court may consider when deciding if there has been a change of circumstances is a demonstrated inability to co-parent effectively since the time the last order was entered."); *In re C.Q.T.M.*, 25 S.W.3d 730, 734 (Tex. App.—Waco 2000, pet. denied) (remarriage and step-parent's conduct and abilities may be considered in modification proceeding).

The above is a summary of the evidence viewed in the light most favorable to the jury's verdict. But Mother also presented some countervailing evidence. For instance, Mother impeached Chavira's credibility. Chavira admitted that she

---

[1] Greg testified that they began dating around November 2018; Mother told Dr. Silverman that they began "dating seriously" in December 2018.

reported the alleged abuse to Father after Greg fired her; Father subsequently hired Chavira, who worked for Father for approximately a year. However, Father later fired Chavira after she claimed that David physically threatened her. Father acknowledged to Dr. Silverman during the child custody evaluation that he wondered if Chavira had "exaggerated" what happened in Mother's custody.

Jean Riopelle Guez, the children's psychologist, testified that changes in the children's behavior could be from the divorce itself or because of Mother's change in marital status.

In Dr. Silverman's report, he noted that Hemphill and Nadurilla, when interviewed by the CPS investigator following the February 2020 allegations, "both expressed discomfort with [Greg], [but] neither nanny reported seeing him hit the children."

Greg testified at trial. He denied allegations of abuse and said that he disciplined primarily by "discussion and time-outs," although he admitted to spanking Wilma once. Greg admitted sending Father more than one hundred text messages, sometimes "many" a day, but he said that they were jokes and he sent them because they were funny. According to Greg, he was antagonistic toward Father because Father would call and threaten Mother.

Mother testified that she asked the kids if Greg beat them and they had no clue what she was referring to. Mother also testified that Father repeatedly threatened that he was going to take away the children away from Mother and that she would not get a dime of his money. According to Mother, the children would come back from Father's house unkempt and dirty.

Vidal Alfred, Mother's current nanny at the time of trial, testified that Mother was a good parent and she never saw Greg be violent. Krystal Burns,

Mother's close friend, testified that Greg's interaction with the children was healthy and not abnormal or questionable. Vera and Anthony Osei, Mother's parents, testified that Mother was a wonderful parent and Greg was a nice stepfather.

We have reviewed the trial transcript, both sides' exhibits, and the parties' arguments. Although Mother presented some evidence that, if credited, contradicted Father's version of events, the jurors were free to believe some witnesses and disbelieve others. *See City of Keller*, 168 S.W.3d at 819. We cannot say, in light of the entire record, that the jury's finding of a change in circumstances was so contrary to the overwhelming weight of the evidence as to be manifestly wrong and unjust. *See Cain*, 709 S.W.2d at 176. Accordingly, we conclude that there is factually sufficient evidence supporting the jury's verdict.

We further conclude that the trial court did not abuse its discretion in allowing Mother's motion for new trial—in which Mother raised the same legal and factual sufficiency arguments we have just discussed—to be overruled by operation of law. *See City of Keller*, 168 S.W.3d at 822-23.

We overrule Mother's two issues on appeal.

### Conclusion

We affirm the trial court's judgment.

/s/     Kevin Jewell
           Justice

Panel consists of Justices Jewell, Bourliot, and Zimmerer.